973 F.2d 243
 61 USLW 2113, 23 Bankr.Ct.Dec. 483, Bankr.
L. Rep. P 74,802
 In re FIRSTCORP, INCORPORATED, Debtor.
RESOLUTION TRUST CORPORATION; Sir Walter Management,
Incorporated; Office of Thrift Supervision,
Plaintiffs-Appellees,
v.
FIRSTCORP, INCORPORATED; Alfred P. Carlton, Jr., Trustee,
successor-in-interest to the Debtor, Firstcorp,
Incorporated, Defendants-Appellants.
 No. 92-1108.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1992.
Decided Aug. 10, 1992.
 
 Lacy H. Reaves, Poyner & Spruill, Raleigh, N.C., argued (Alfred P. Carlton, Jr., McNair Law Firm, on brief), for defendants-appellants.
 Harvey Alan Levin, Asst. Chief Counsel, Office of Thrift Supervision, Washington, D.C., argued, for Appellee OTS (Michael Edward Tucci, Morrison & Hecker, Washington, D.C., on brief), for plaintiffs-appellees RTC and Sir Walter Management. (Jonathan B. Taylor, Sr. Atty., Resolution Trust Corp., Washington, D.C., Jonathan R. Harkavy, Martha A. Geer, Patterson, Harkavy, Lawrence, Van Noppen & Okun, Greensboro, N.C., on brief), for plaintiffs-appellees RTC and Sir Walter Management.
 Before PHILLIPS, SPROUSE, and WILKINSON, Circuit Judges.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 This case raises the question of the appropriate treatment under federal law of a savings and loan holding company's commitment to maintain the capital of a purchased savings and loan subsidiary when the holding company files for bankruptcy under Chapter 11. For the reasons that follow, we hold that the appellant holding company had undertaken a capital maintenance obligation in this case and that it was required under 11 U.S.C. § 365(o ) to cure any deficit in that obligation before it could reorganize under Chapter 11. In so holding, we affirm the judgment of the district court.
 
 I.
 
 2
 The facts relevant to this appeal are not in dispute. Appellant Firstcorp, Inc., is a multiple savings and loan holding company based in Raleigh, North Carolina. As of the events in question, Firstcorp had two wholly owned subsidiaries, First Federal Savings and Loan Association of Raleigh (FF-Raleigh) and First Federal Savings and Loan Association of Durham (FF-Durham). Both FF-Raleigh and FF-Durham are federally insured savings and loan institutions.
 
 
 3
 Firstcorp acquired FF-Raleigh in March 1985. Under federal law, this acquisition required the approval of the Federal Home Loan Bank Board (FHLBB), which was then the primary regulator of federally chartered savings and loans. See 12 U.S.C. § 1730a(e) (1988), repealed by Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, Title IV, § 407, 103 Stat. 183, 363. FHLBB approved Firstcorp's application in FHLBB Resolution No. 85-219 (Mar. 29, 1985). That approval, however, was subject to numerous conditions. Condition 5 required Firstcorp to maintain FF-Raleigh's capital at or above a specified level:
 
 
 4
 [T]he acquisition of [FF-Raleigh] by Firstcorp is approved provided the following conditions are complied with in a manner satisfactory to the Supervisory Agent:
 
 
 5
 . . . . .
 
 
 6
 5. That, on the date that the proposed acquisition is consummated and at each calendar quarter thereafter for as long as Firstcorp controls [FF-Raleigh], the regulatory net worth of [FF-Raleigh] shall be maintained at the greater of: (1) three percent of total liabilities ..., or (2) a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts ..., as now or hereafter in effect, and where necessary, to infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement. [Emphasis in the original.]
 
 
 7
 In January 1990, operating losses caused by non-performing real estate loans made it likely that FF-Raleigh would be unable to satisfy the minimum capital requirements imposed by federal law. See 12 C.F.R. §§ 567.1-567.20 (1990). Firstcorp therefore requested from appellee Office of Thrift Supervision (OTS), the regulatory successor to FHLBB, see 12 U.S.C. § 1462a(e) (Supp. II 1990), a "temporary forbearance" from the capital maintenance obligation imposed by FHLBB Resolution No. 85-219. OTS denied this request and directed Firstcorp on several occasions thereafter to bring FF-Raleigh into compliance with federal minimum capital requirements by infusing capital into FF-Raleigh. Although FF-Raleigh acknowledged that, as of March 31, 1990, its capital was less than that required by federal law, Firstcorp did not infuse any capital into FF-Raleigh. OTS has estimated that, as of the end of March, the deficiency in Firstcorp's capital maintenance obligation was about $6 million; by September 30, this figure had jumped to $45 million.
 
 
 8
 Following extensive negotiations, on November 30, 1990, FF-Raleigh and OTS entered into a consent agreement. That agreement, which contained an acknowledgement by FF-Raleigh that it had insufficient capital, imposed numerous restrictions on the continued operation of FF-Raleigh. It also explicitly provided that "[n]othing in this Agreement ... shall serve to preclude Firstcorp ... from honoring its net worth maintenance obligations pursuant to FHLBB Resolution 85-219, and [FF-Raleigh's] receiving the benefit of such obligations."
 
 
 9
 Also on November 30, OTS served Firstcorp with a notice of charges and hearing and with a temporary order to cease and desist. The notice of charges and hearing, issued pursuant to 12 U.S.C. § 1818(b), initiated an administrative proceeding against Firstcorp and charged it with committing an "unsafe or unsound practice" by failing to fulfill its obligation to maintain the capital of FF-Raleigh. The cease and desist order, issued pursuant to 12 U.S.C. § 1818(c), required Firstcorp, inter alia, to extinguish certain capital notes FF-Raleigh issued it and to transfer its ownership interest in FF-Durham to FF-Raleigh, both in partial satisfaction of its capital maintenance obligation.
 
 
 10
 In response to the OTS's actions, Firstcorp filed a complaint on December 4 in the Eastern District of North Carolina that sought to enjoin OTS from enforcing the cease and desist order. The next day, December 5, before the district court could rule on the complaint, Firstcorp filed a petition in bankruptcy under Chapter 11.[1] Then, on December 7, OTS appointed appellee Resolution Trust Corp. (RTC) as receiver for FF-Raleigh based on the fact that FF-Raleigh was in an unsafe and unsound condition because it had insufficient capital. See 12 U.S.C. § 1464(d)(2)(A)(iii) (Supp. II 1990).
 
 
 11
 Following the appointment of RTC as receiver of FF-Raleigh, OTS chartered a new federal mutual savings institution, First Federal Savings Association of Raleigh (Raleigh Savings). RTC then entered into a "purchase and assumption" transaction with Raleigh Savings: in effect, Raleigh Savings assumed certain of FF-Raleigh's liabilities (including its deposit liabilities), and the new entity purchased certain of FF-Raleigh's assets. OTS then appointed RTC as the conservator of Raleigh Savings. Recently, OTS replaced RTC as conservator of Raleigh Savings with RTC as receiver of that institution.
 
 
 12
 In March 1991, both OTS and RTC, in separate motions, asked the bankruptcy court to order Firstcorp to assume its commitment under FHLBB Resolution No. 85-219 and to immediately cure the deficiency in the capital maintenance obligation existing as of the date of the bankruptcy filing. The motions were made pursuant to 11 U.S.C. § 365(o), which provides in part that:
 
 
 13
 In a case under chapter 11 of this title, the trustee shall be deemed to have assumed[,] ... and shall immediately cure any deficit under, any commitment by the debtor to ... the Director of the Office of Thrift Supervision ... or its predecessors ... to maintain the capital of an insured depository institution....
 
 
 14
 11 U.S.C. § 365(o) (Supp. II 1990). The bankruptcy court denied the motions. In re Firstcorp, Inc., 126 B.R. 688 (Bankr.E.D.N.C.1991). The court concluded that, even if the commitment is "deemed assumed" under § 365(o ) upon the bankruptcy filing, the commitment "expired by its own terms." Id. at 691. FHLBB Resolution No. 85-219 imposed the commitment only "for as long as Firstcorp controls" FF-Raleigh, and the court held that Firstcorp lost control of FF-Raleigh when it was placed in receivership two days after Firstcorp filed for bankruptcy. Thus, concluded the court, § 365(o ) was inapplicable. Id.
 
 
 15
 On appeal, the district court reversed. It held that, as of the date of the bankruptcy filing, Firstcorp controlled FF-Raleigh. Concluding that § 365(o )' § requirement of an immediate cure attaches at the moment of the bankruptcy filing, the court held that the subsequent appointment of RTC as receiver of FF-Raleigh did not relieve Firstcorp of the obligations imposed by § 365(o ) at the time of the bankruptcy filing. The district court then remanded the case to the bankruptcy court "with instructions to grant the relief which OTS and RTC seeks [sic ] through their section 365(o ) motion[s]."
 
 
 16
 From this decision Firstcorp has appealed.
 
 II.
 A.
 
 17
 Section 365(o ) was enacted as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990 (Thrift and Bank Fraud Act or the Act), which constitutes Title XXV of the Crime Control Act of 1990, Pub.L. No. 101-647, § 2522(c), 104 Stat. 4789, 4866-67. The Act was a response to the savings-and-loan crisis, which has cost American taxpayers tens of billions of dollars. See 136 Cong.Rec. S17,601 (daily ed. Oct. 27, 1990) (statement of Sen. Biden). As part of that response, Congress sought "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." H.R.Rep. No. 681(I), 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6585. It accomplished this goal through § 365(o ), which "prevent[s] the trustee from rejecting any such commitment as an executory contract under his usual 'avoidance' powers" pursuant to 11 U.S.C. § 365(a).[2] Id. at 180, reprinted in 1990 U.S.C.C.A.N. at 6586. Section 365(o) reads in full as follows:
 
 
 18
 In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or its predecessors or successors, to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of any such agency.
 
 
 19
 11 U.S.C. § 365(o) (Supp. II 1990).
 
 
 20
 We think that the meaning and function of § 365(o ) is plain from its language: in every Chapter 11 case, the trustee--or, as here, the debtor-in-possession, see 11 U.S.C. § 1107(a) (1988)--"shall be deemed to have assumed" any capital maintenance commitment made by the debtor, and if a deficit under such a commitment arises, he "shall immediately cure [it]."
 
 
 21
 Three characteristics of the statutory language are worth noting. First, unlike the avoidance power to which it is an exception, see note 2, supra, § 365(o ) is mandatory with regard to both the assumption and the cure. In other words, the trustee (or debtor-in-possession) may not decline to assume the obligation and cure a deficit thereunder. Second, the assumption and obligation to cure occur by operation of law, without review by or approval of the bankruptcy court--again unlike the assumption or rejection of executory contracts under § 365(a). See id. Finally, the obligation to cure attaches "immediately"[3]--i.e., "without lapse of time; without delay; instantly; at once." Random House Dictionary of the English Language 957 (2d ed. unabridged 1987). This means, in our view, that assumption and cure under § 365(o ) are prerequisites to obtaining Chapter 11 protection. If a debtor cannot "immediately" cure a deficit under a capital maintenance commitment that exists at the time of a bankruptcy filing, then § 365(o ) requires that debtor to proceed not under Chapter 11 but under Chapter 7, to which § 365(o ) does not apply.
 
 B.
 
 22
 Firstcorp contends on two grounds that our interpretation of § 365(o ) is inconsistent with other provisions of the Bankruptcy Code. First, it argues that § 365(o ) cannot be interpreted as requiring a cure immediately upon the filing of a Chapter 11 petition because other provisions of the Bankruptcy Code, unlike § 365(o), explicitly establish the filing of a petition as the operative event for certain statutory purposes. See, e.g., 11 U.S.C. §§ 109(e), 502(b), 521(2)(A), 541(d), and 544 (1988). According to Firstcorp, Congress is explicit when it pegs certain actions to the filing of the petition, and § 365(o ) does not explicitly tie a § 365(o) cure to the initial filing.
 
 
 23
 We find this argument unpersuasive. If there is a deficit in a capital maintenance obligation at the time of a Chapter 11 filing, we cannot imagine what the phrase "shall immediately cure" means other than that a cure is, in effect, a prerequisite to reorganization under Chapter 11. The word "immediately" simply does not admit of a less rigorous interpretation than that we present here, and we decline Firstcorp's invitation to require Congress to use talismanic language in writing federal statutes. Moreover, although Firstcorp strenuously objects to the interpretation we adopt here, it fails to provide an alternative interpretation of § 365(o ) that does not read the word "immediately" completely out of the statute. We must assume, of course, that Congress intended each word in § 365(o ) to have some function. See Norfolk & W. Ry. v. United States, 768 F.2d 373, 379 (D.C.Cir.1985).
 
 
 24
 Second, Firstcorp argues that requiring "[a]n immediate turnover in assets on the day the case is filed" is inconsistent with the parenthetical language in the first sentence of § 365(o ): "the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, [the capital maintenance commitment]." Section 507 establishes the relative priority of certain claims in bankruptcy, see 11 U.S.C. § 507(a) (1988 & Supp. II 1990), and the Thrift and Bank Fraud Act added an eighth, and lowest, priority for "allowed unsecured claims based upon any commitment by the debtor to [a federal regulatory agency] to maintain the capital of an insured depository institution." Crime Control Act of 1990, Pub.L. No. 101-647, Title XXV, § 2522(d), 104 Stat. 4789, 4867 (codified at 11 U.S.C. § 507(a)(8) (Supp. II 1990)). Firstcorp contends that the parenthetical language requires that any cure of a deficit under a capital maintenance commitment be accorded priority only according to § 507. Requiring a cure immediately upon the Chapter 11 filing would be inconsistent with such a commitment's eighth priority under § 507, according to Firstcorp, because it would impermissibly allow such a claim to jump ahead of those with superior priority under § 507(a)(1) to (7).
 
 
 25
 We recognize that the function of the parenthetical language under the statutory framework is not entirely clear. We do not believe, however, that it subjects to the priority scheme of § 507 the cure required of breaches existing at the time of the Chapter 11 filing. This is clear from the clause in § 365(o ) that provides that "any claim for a subsequent breach of the obligations [under a commitment] shall be entitled to priority under section 507" (emphasis added). Had the parenthetical language subjected all claims based on breaches to the § 507 priority scheme, even claims existing as of the bankruptcy filing, this clause would be superfluous. Further, we note that the parenthetical modifies only the deemed assumed requirement, not the immediate cure requirement; thus, an immediate cure is required whether or not consistent with § 507.
 
 
 26
 Accordingly, we view § 365(o )'s requirement of an immediate cure of a breach existing as of the Chapter 11 filing as representing a statutory command that is a prerequisite to reorganization, not an ordinary "expense [or] claim" subject to § 507. See 11 U.S.C. § 507(a) (1988). The parenthetical language, therefore, like the subsequent breach clause, merely indicates that breaches in capital maintenance obligations that arise after the bankruptcy filing are subject to the priority scheme of § 507.[4]
 
 C.
 
 27
 We therefore conclude that assumption of a capital maintenance obligation and cure of a deficit under such an obligation are pre-requisites to reorganization under Chapter 11. The policy behind these statutory requirements is straightforward. In the Thrift and Bank Fraud Act, Congress determined that a depository institution holding company that has committed to maintain the capital of a depository institution subsidiary that has become unprofitable cannot use a Chapter 11 reorganization to jettison the subsidiary in an effort to enhance its own financial position and that of its creditors, while leaving the federal deposit insurance system (and ultimately the taxpayers) to bail out the capital-deficient subsidiary. If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o ) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option. Through this mechanism, § 365(o ) places the financial interest of the federal deposit insurance system ahead of that of the holding company and its creditors.
 
 
 28
 Firstcorp claims that this policy is inapplicable when, as here, the subsidiary is in receivership. It argues that a capital maintenance obligation functions to protect depositors by ensuring the institution's viability, and that the institution's viability is not threatened once it is placed in receivership. We reject this argument. To begin with, OTS placed FF-Raleigh in receivership precisely because Firstcorp failed to live up to its capital maintenance obligation. Thus, absolving Firstcorp of its liability under that obligation because FF-Raleigh is now in receivership would reward the very conduct that made the receivership necessary and leave the federal deposit insurance system--and ultimately the federal taxpayers--to pick up the tab.
 
 
 29
 Further, Firstcorp commits a more basic error: it misconceives the function of capital maintenance obligations. Such obligations ensure that subsidiaries of holding companies have adequate levels of capital. Contrary to Firstcorp's argument, capital does not serve to protect depositors; protection of depositors is the role of federal deposit insurance. See 12 U.S.C.A. § 1821(a) (West Supp.1992) (providing federal insurance for deposits of $100,000 or less). Rather, capital functions to maintain the viability of the federal deposit insurance system by reducing the potential cost to that system of resolving failed depository institutions. It does this both by diminishing the risk that a depository institution will become insolvent and thus require a federal bailout and by decreasing the cost to the insurance system if such a bailout becomes necessary. See generally Note, FIRREA: Controlling Savings and Loan Association Credit Risk Through Capital Standards and Asset Restrictions, 100 Yale L.J. 149, 158-59 (1990). Capital's role in reducing the cost to the federal deposit insurance system continues even after an institution has been placed in receivership: capital represents a pool of resources that is used to pay off depositors if, because of loan defaults, deposits exceed an institution's assets. In such circumstances, capital minimizes the cost of any federal bailout of the institution. Applied to the instant case, these principles suggest that, if Firstcorp does not provide the approximately $45 million it owes under its capital maintenance obligation, the federal deposit insurance system may very well be forced to contribute that amount.
 
 III.
 
 30
 Firstcorp also contends that, notwithstanding our interpretation of § 365(o), the terms of FHLBB Resolution No. 85-219 do not require it to infuse capital into FF-Raleigh. We reject its contentions.
 
 A.
 
 31
 Firstcorp first argues that condition 5 of FHLBB Resolution No. 85-219 does not constitute a "commitment" on the part of Firstcorp "to maintain the capital" of FF-Raleigh within the meaning of 11 U.S.C. § 365(o ). It claims that condition 5 is ambiguous as to who is required to maintain FF-Raleigh's capital and, if necessary, infuse capital to FF-Raleigh. It contrasts condition 5 with other conditions, which explicitly state that the subject of the obligation is Firstcorp.[5]
 
 
 32
 We think Firstcorp's argument insubstantial. To be sure, condition 5 is not a model of well-crafted prose; the capital maintenance requirement is written in the passive voice ("the regulatory net worth of [FF-Raleigh] shall be maintained ..."), and the infusion provision ("to infuse sufficient additional equity capital ...") lacks an antecedent. Nonetheless, the obligations imposed by condition 5 are clearly placed on Firstcorp. First, it is evident from the context that Firstcorp is the subject of the capital maintenance and infusion obligations. Condition 5 is one of numerous conditions imposed upon Firstcorp's acquisition of FF-Raleigh; at no point in the entire resolution does FHLBB impose obligations on a party other than Firstcorp. Indeed, the entire purpose for Resolution 85-219 was to condition the acquisition of FF-Raleigh on Firstcorp's assumption of a series of rather significant obligations.
 
 
 33
 Second, the only entity that possibly could be subject to condition 5 is Firstcorp. Although Firstcorp suggests that the capital maintenance obligation was imposed on FF-Raleigh as a limitation on its payment of dividends, this interpretation would render condition 5 superfluous, because condition 6 already forbids Firstcorp from causing FF-Raleigh to pay dividends when the result would be a reduction of its regulatory net worth below the level specified in condition 5. Moreover, condition 5 applies only as long as Firstcorp controls FF-Raleigh--a limitation that would make little sense if the obligation was imposed on FF-Raleigh itself rather than on Firstcorp. Further, it cannot be argued that condition 5 requires FF-Raleigh to infuse capital into itself; only Firstcorp is in a position to provide an infusion of capital.
 
 
 34
 Finally, Firstcorp's claim that FHLBB Resolution 85-219 does not impose upon it a capital maintenance obligation comes rather late in the day. Prior to OTS's and RTC's motions under § 365(o ), Firstcorp not only did not deny the existence of a capital maintenance obligation, it also explicitly acknowledged that it was subject to such an obligation. In its January 23, 1990, letter to OTS seeking a forbearance of condition 5, Firstcorp stated explicitly that, "[a]t the time the acquisition of [FF-Raleigh] by [Firstcorp] was approved, the FHLBB resolution approving the transaction contained the then-standard language requiring it [i.e., Firstcorp] to maintain the regulatory net worth of [FF-Raleigh] at required levels." Moreover, the consent agreement between OTS and FF-Raleigh, signed just days before the bankruptcy filing, acknowledged Firstcorp's "net worth maintenance obligations pursuant to FHLBB Resolution 85-219."[6]
 
 B.
 
 35
 Firstcorp further argues that, even if FHLBB Resolution No. 85-219 constitutes a commitment, it still imposes no obligations upon it. Firstcorp notes that FHLBB Resolution No. 85-219 imposed the capital maintenance obligation only "for as long as Firstcorp controls [FF-Raleigh]." It contends that it lost control of FF-Raleigh, and the commitment therefore terminated, as a result of either of two events. Firstcorp first claims that it lost control of FF-Raleigh as a result of the November 30, 1990, consent agreement with OTS. It argues that, under that agreement, OTS's control over the operations of FF-Raleigh was "pervasive" and "touched every aspect of the institution and its relationship with Firstcorp." Because OTS's authority over FF-Raleigh was so extensive and its own power so limited, argues Firstcorp, it did not have "effective control" over FF-Raleigh. Accordingly, there was no commitment as of the Chapter 11 filing and § 365(o ) is therefore simply inapplicable.
 
 
 36
 We reject this argument. As we noted above, the consent agreement itself explicitly indicated that "[n]othing in this Agreement ... shall serve to preclude Firstcorp ... from honoring its net worth maintenance obligations pursuant to FHLBB Resolution 85-219...." Further, under federal law in effect both in 1985 when FHLBB Resolution No. 85-219 was adopted and today, "control" of an institution is defined to include ownership of more than twenty-five percent of the voting shares of that institution. See 12 C.F.R. § 583.26(a) (1985); 12 C.F.R. § 583.7(a) (1992); 12 U.S.C. § 1467a(a)(2)(A) (Supp. II 1990). Because Firstcorp owned all of the voting shares in FF-Raleigh, even after the consent agreement it controlled that institution as a matter of law. Finally, we agree with the bankruptcy court that, though the consent agreement placed numerous restrictions on the operations of FF-Raleigh, Firstcorp still retained sufficient authority over its subsidiary to be considered in control in a functional sense. See 126 B.R. at 691 n. 2.
 
 
 37
 Firstcorp also claims that it lost control of FF-Raleigh when that institution was placed in receivership on December 7, 1990. Thus, when in March 1991 OTS and RTC sought to enforce the capital maintenance commitment, that commitment had, by its own terms, terminated. Firstcorp notes that § 365(o ) provides that "[t]his subsection shall not extend any commitment that would otherwise be terminated by any act of [a federal regulatory] agency," and it concludes that requiring it now to cure FF-Raleigh's capital deficit would have the effect of "extending" a commitment that has otherwise terminated.
 
 
 38
 Again we reject Firstcorp's argument. We assume arguendo that the receivership ended Firstcorp's control over FF-Raleigh and therefore terminated its capital maintenance commitment. That termination, however, operated only to absolve Firstcorp of any obligation to continue maintaining FF-Raleigh's capital and thereby cleared it of any liability arising from further deterioration of FF-Raleigh's capital occurring after December 7. Termination in no way absolved Firstcorp of the existing, matured liability that had attached as of December 5, when it filed for bankruptcy. In no sense, therefore, would an order requiring Firstcorp to satisfy the liability due on December 5 "extend" the commitment beyond its termination.
 
 
 39
 Moreover, acceptance of Firstcorp's claim that receivership terminates § 365(o ) liability that had previously matured would have particularly perverse results. Under Firstcorp's interpretation, a holding company obligated to maintain the capital of a depository institution could avoid that obligation entirely simply by ignoring it: once the institution's financial position deteriorated to such an extent that federal regulators were forced to step in and take control, the holding company could argue that its liability under the capital maintenance obligation was thereby extinguished. Congress could not have intended such a result.
 
 IV.
 
 40
 In sum, FHLBB Resolution No. 85-219 constitutes a commitment by Firstcorp to maintain the capital of FF-Raleigh, and § 365(o ) required Firstcorp to cure the deficit in that commitment "immediately" upon its Chapter 11 filing on December 5, 1990. The subsequent placement of FF-Raleigh in receivership did not absolve Firstcorp of the obligation to cure the capital deficiency that existed as of its bankruptcy filing. OTS and RTC were entitled, therefore, to the relief they sought below. Accordingly, the judgment of the district court is
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 Firstcorp subsequently filed an adversary proceeding in the bankruptcy court, seeking to bar OTS's administrative proceeding and cease and desist order. The bankruptcy court held that the automatic stay of 11 U.S.C. § 362 applied to OTS proceedings and therefore stayed OTS's enforcement proceeding and the cease and desist order. In re Firstcorp, Inc., 122 B.R. 484 (Bankr.E.D.N.C.1990). On appeal, the district court reversed the bankruptcy court. In re Firstcorp, Inc., 129 B.R. 450 (E.D.N.C.1991). On appeal to this court, a panel recently affirmed the district court and held that the automatic stay applies to neither the OTS enforcement proceeding nor the cease and desist order. Carlton v. Firstcorp, Inc., 967 F.2d 942 (4th Cir.1992)
 
 
 [2]
 Section 365(a) provides that, with certain exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." 11 U.S.C. § 365(a) (1988)
 
 
 [3]
 Section 365(o) differs in this respect as well from the assumption power under § 365(a). For example, although in general a trustee may not assume an executory contract in which there has been a default, there is an exception if he "cures, or provides adequate assurance that [he] will promptly cure, such default." 11 U.S.C. § 365(b)(1)(A) (1988) (emphasis added)
 
 
 [4]
 One remaining question involving the intersection of § 365(o ) and § 507 regards the appropriate priority to be given claims for subsequent breaches. Obligations under executory contracts assumed at the time of bankruptcy are normally considered administrative expenses and are therefore accorded first priority. See, e.g., In re Coast Trading Co., 744 F.2d 686, 692 (9th Cir.1984). Consistent with this, OTS appears to argue that claims for subsequent breaches of capital maintenance obligations are entitled to first priority under § 507(a)(1). It is unclear what role OTS would ascribe to § 507(a)(8), which explicitly gives such claims eighth priority. RTC appears to disagree with this analysis, stating that if a deficit in a capital maintenance obligation occurs during a reorganization, a claim based on that deficit receives eighth priority under § 507(a)(8). Because this case involves a breach existing as of the Chapter 11 filing, we need not resolve this question
 
 
 [5]
 Firstcorp does not argue that, even if it is the target of the obligations imposed by condition 5, those obligations do not constitute a statutory "commitment." Nor could it. Although the term is defined in neither § 365(o ) nor its legislative history, the common definition of commitment is "[a]greement or pledge to do something," Black's Law Dictionary 248 (5th ed. 1979)--which condition 5 of FHLBB Resolution No. 85-219 clearly is
 
 
 [6]
 Firstcorp also argues that the existence of the commitment was not adequately established below. It claims that the bankruptcy court expressly reserved the question and notes that the district court itself made no findings in this regard. We disagree. The bankruptcy court found as a fact that FHLBB Resolution No. 85-219 "requir[ed] Firstcorp ... to maintain defined capital requirements and to 'infuse' additional equity capital if necessary." 126 B.R. at 689. What the bankruptcy court reserved was whether this commitment was enforceable. Id. at 692 n. 3. A capital maintenance obligation imposed as a condition of FHLBB's approval of an acquisition, however, is clearly enforceable by OTS under settled law. See Kaneb Servs., Inc. v. Federal Savings & Loan Ins. Corp., 650 F.2d 78 (5th Cir.1981)