360 F.3d 972
 CHICKALOON-MOOSE CREEK NATIVE ASSOCIATION, INC.; Knikatnu, Inc.; Ninilchik Native Association, Inc.; Tyonek Native Corporation; Cook Inlet Region, Inc.; Seldovia Native Association, Inc., Plaintiffs-Appellants,
v.
Gale A. NORTON, Secretary of the Interior; Tom Allen; Brenda Zenan; Terry Hassett; United States of America; U.S. Department of the Interior; Bob Armstrong, Defendants-Appellees.
 No. 01-35921.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted August 12, 2003 — Anchorage, Alaska.
 Filed February 26, 2004.
 
 David C. Crosby, Juneau, Alaska; Bruce E. Gagnon, Atkinson, Conway & Gagnon, Inc., Anchorage, Alaska; James D. Linxwiler, Guess & Rudd, PC, Anchorage, Alaska, for the appellants.
 Andrew C. Mergen, Lisa E. Jones, United States Department of Justice, Environment and Natural Resources Division, Washington, DC, for the appellees.
 Rebecca L. Bernard, Trustees for Alaska, Anchorage, Alaska, for the amici curiae.
 Appeal from the United States District Court for the District of Alaska; James K. Singleton, Chief Judge, Presiding. D.C. No. CV-97-00430-JKS.
 Before: HARRY PREGERSON, WILLIAM C. CANBY, Jr., and SIDNEY R. THOMAS, Circuit Judges.
 Opinion by Judge Canby.
 OPINION
 CANBY, Circuit Judge:
 
 
 1
 The Alaska Native Claims Settlement Act of 1971 ("ANCSA"), 43 U.S.C. § 1601 et seq., extinguished all aboriginal title in Alaska and, in partial compensation, provided for Native villages to select specified acreages of land from the public domain. Id. at § 1611. The selection process ran into difficulties in the most populous area of Alaska, Cook Inlet. In 1976, the Department of the Interior ("Interior") and Cook Inlet Region, Inc. (CIRI), an Alaska Native regional corporation, entered into an agreement, known as the Deficiency Agreement, to govern the conveyance of lands from the federal government to CIRI for reconveyance to Alaska Native village corporations within the Region. The agreement described lands eligible for conveyance in two separate appendices to the agreement: Appendix A and Appendix C. The primary issue in this case is whether, under the terms of the agreement and the statute implementing it, all of the lands listed in Appendix A must be transferred before any of the lands in Appendix C will be made available, even though the villages have selected some Appendix C lands in preference to Appendix A lands to fulfill their statutory entitlement. We conclude, as did Interior and the district court, that the Deficiency Agreement requires the Appendix A lands to be exhausted before any Appendix C lands may be transferred to CIRI for reconveyance to the villages. Because the Appendix A lands are sufficient to satisfy the villages' acreage entitlements, the villages will be required to accept some tracts of Appendix A lands in place of Appendix C lands that they selected as being more desirable.
 
 I.
 
 2
 The Deficiency Agreement arose out of a compromise intended to resolve severe difficulties that had arisen with regard to Village land selections in the Cook Inlet region. In order to provide a context for understanding the dispute over the meaning of the Agreement, it is necessary to recite some of the developments leading up to its adoption.
 
 A. The Alaska Native Claims Settlement Act
 
 3
 ANCSA extinguished all aboriginal title and claims of aboriginal title to lands in Alaska in exchange for the distribution of $962,500,000 and over forty million acres of land to Alaska Natives. See 43 U.S.C. §§ 1603(b), 1605(a), 1611. The Act provided for the establishment under state law of regional and village corporations in which Alaska Natives would be the shareholders. See 43 U.S.C. § 1607. The village plaintiffs in this case, Chickaloon-Moose Creek Native Association, Inc., Knikatnu, Inc., Ninilchik Native Association, Inc., Seldovia Native Association, Inc., and Tyonek Native Corporation, (collectively "the Villages") are all village corporations within the region of a regional corporation known as Cook Inlet Region, Inc. ("CIRI").
 
 
 4
 ANCSA did not convey lands directly to village or regional corporations, but provided a method for accomplishing transfer. Among other things, ANCSA required Interior to withdraw all available public lands in the township in which any Native Village was located, as well as all public lands in two concentric rings of townships around the Village. See 43 U.S.C. § 1610(a). It was from this withdrawn land that it was contemplated that the villages could select the acreages to which ANCSA entitled them.
 
 B. The Villages' Section 12(a) Selections
 
 5
 Cook Inlet region, where the plaintiff Villages are located, lies along Alaska's south-central coast and is one of the most heavily populated areas of the state. Considerable segments of the land near the Villages are either owned by third parties or are under water. As a consequence, the withdrawals mandated by ANCSA immediately surrounding the Villages were not sufficient to satisfy the Villages' entitlement. Accordingly, Interior made compensatory "deficiency withdrawals" from the nearest unreserved, vacant and unappropriated lands. See 43 U.S.C. § 1610(a)(3).
 
 
 6
 Section 12(a) of ANCSA authorized each village to select its designated number of acres from withdrawn lands.[1] These are known as "section 12(a) selections." ANCSA required that each Village's section 12(a) selections must be "contiguous and in reasonably compact tracts," and "shall be ... wherever feasible, in units of not less than 1,280 acres." 43 U.S.C. § 1611(a)(2).
 
 
 7
 In addition to lands received by the Villages pursuant to section 12(a), section 12(b) of the statute required Interior to allocate additional lands to each regional corporation on the basis of Native population until the total acreage from sections 12(a) and 12(b) equaled 22 million acres. See 43 U.S.C. § 1611(b). The regional corporations receiving section 12(b) lands were required to distribute those lands among its constituent village corporations "on an equitable basis." See id. Villages' selection of lands to be received from a regional corporation pursuant to this mandate were known as "section 12(b) selections."
 
 
 8
 As the district court noted, the process of land withdrawal and selection did not go smoothly in the Cook Inlet region. The Act required the Villages to make their 12(a) selections by December 18, 1974, but as the deadline approached, the eligibility of two villages in CIRI's region, Salamatoff and Alexander Creek, was unresolved. Due to this uncertainty, Interior did not designate land withdrawals for each village specifically, but withdrew a single block of land for all five plaintiff Villages along with Salamatoff and Alexander Creek. This maneuver forced the Villages to compete for the same land. To resolve this potential conflict, the Villages decided to make and prioritize their selections of various tracts of land in a series of rounds, in a manner roughly similar to that of major league sports teams drafting players. Each of the plaintiff Villages thus ended the process with a list, in order of preference, of lands they elected to receive, often in scattered locations within the withdrawn lands.[2]
 
 
 9
 Because the Villages divided up their entitlements by selecting lands in rounds, there was a concern that their section 12(a) selections would not satisfy the Act's requirements that these selections be compact and contiguous, and in minimum sizes of 1,280 acres. Prior to filing their selections, however, Bureau of Land Management (BLM) officials assured the Villages that even if their individual selections did not meet these requirements of the Act, they would be accepted as long as their selections as a whole formed a compact and contiguous block. Relying on those assurances, the Villages filed their section 12(a) selections with Interior on December 17, 1974. The Villages also filed blanket section 12(b) selections on all lands withdrawn for their benefit pending a determination of the specific land to be allocated to CIRI under that section.
 
 C. The Terms and Conditions Agreement
 
 10
 The selection process posed problems for the Villages, the federal government, and the State of Alaska. The Villages complained that Interior's deficiency withdrawals involved much lower quality land than the original lands surrounding their villages that were deemed ineligible for withdrawal. The Villages accordingly filed a lawsuit, Cook Inlet v. Kleppe, No. 75-2232, challenging the validity of the deficiency withdrawals. The federal government was concerned because it desired some of the lands selected by the Villages in their 12(a) selection draft for the creation of a national park around Lake Clark.[3] As a result, Interior, the State of Alaska, and CIRI entered into a series of negotiations that resulted in an agreement entitled "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area" ("Terms and Conditions").
 
 
 11
 The Terms and Conditions were essentially a large land trade between Alaska, the federal government and CIRI. CIRI acquired certain oil producing lands in the Kenai peninsula, the state acquired certain lands, and Interior received some of the lands it wanted in order to create Lake Clark National Park. To accomplish the latter purpose, the Villages (who were not actually parties to the Terms and Conditions) would have to give up their section 12(a) claims to lands surrounding Lake Clark in exchange for other selections. In addition, the federal government wanted to leave open the possibility of expanding the Lake Clark Park into the Chinitna Peninsula, an area that includes many of the Villages' desired section 12(a) selections that are the subject of this appeal (i.e., they are Appendix C lands in the Deficiency Agreement). Interior therefore wanted to make sure that the only peninsular lands conveyed to the Villages were lands chosen through their section 12(a) selections, not those designated pursuant to section 12(b). Paragraph VII.A of the Terms and Conditions therefore required CIRI's section 12(b) allocations to come from specified lands, which did not include Chinitna Peninsula. As for the Villages' 12(a) land selections located in Chinitna, paragraph VII.B of the agreement allowed for the future possibility of a land swap between the Villages and Interior whereby Interior would give the Villages other lands in exchange for their 12(a) selections in Chinitna. Paragraph VIII.A stated that such a trade could not occur without the consent of the affected villages.
 
 
 12
 The Terms and Conditions required congressional authorization, and Congress ratified the agreement through Pub.L. No. 94-204, 89 Stat. 1145, 43 U.S.C. § 1611 (note) (1976). The legislation, however, contained three preconditions that had to be met before the agreement could go into effect: (1) the State of Alaska had to convey certain lands to the United States for possible reconveyance to CIRI, (2) the Villages had to withdraw their appeal in Cook Inlet v. Kleppe, and (3) the Villages had to relinquish their selections of certain lands around Lake Clark so that Interior could obtain its lands for the park. (The selections identified for relinquishment by the Villages were near Lake Clark, and must be distinguished from the Chinitna Peninsula selections that were identified for a possible future trade in paragraph VII.B.) The three conditions were fulfilled in 1978 and the Terms and Conditions then went into effect.
 
 
 13
 The Terms and Conditions bear on the present dispute because the Villages contend that the Deficiency Agreement was intended to be consistent with the Terms and Conditions, and that the Terms and Conditions clearly recognized the Villages' section 12(a) selections in the Chinitna Peninsula and provided that the federal government might later acquire those tracts only by consent of the Villages. The Villages also argue that, if they had known that they were not to receive their 12(a) selections now being denied to them, they would not have fulfilled the statutory conditions — dismissal of the lawsuit and relinquishment of the Lake Clark selections — that permitted the Terms and Conditions to go into effect.
 
 
 14
 D. Rejection of the Villages' 12(a) selections
 
 
 15
 In May 1976, BLM completed its evaluation of the 12(a) selections submitted by the Villages in 1974 and, in a series of decisions, rejected many of the Villages' selections. The main reason for most of the rejections was that the Villages' selections did not meet the "compact and contiguous" requirement or the 1,280-acre minimum size requirement of ANCSA. Other selections were rejected because the land was either not authorized for selection or was reserved for selection by other villages. These decisions caused alarm and anger among the Villages, who had been told previously by BLM that their failure to meet the compact and contiguous requirements would not hinder approval of their selections. The rejections had potentially grave consequences for the Villages because ANCSA contained no provisions for allowing the resubmission of new selections after the 1974 statutory deadline. Thus, the Villages were faced with the prospect of losing a significant portion of their statutory land entitlements. They pursued an administrative appeal of the BLM decision.
 
 
 16
 The rejection decisions also upset several officials at Interior who had negotiated the Terms and Conditions. They feared that the Villages, in light of the rejections of their selections, would no longer agree to meet the preconditions of the Terms and Conditions, and that as a result, Interior would not be able to obtain the lands necessary for the creation of Lake Clark National Park.
 
 E. The Deficiency Agreement
 
 17
 A flurry of communication followed BLM's rejections of the Village selections, and BLM ultimately secured a remand of its appealed rejections so that a negotiated solution could be reached. The ultimate result of the negotiations was the Deficiency Agreement between CIRI and Interior. Although the Villages were highly interested in the negotiations, they were not parties to the Agreement. The Agreement contemplated transfer of withdrawn lands from the federal government to CIRI, for retransfer to the Villages. The Agreement, in most relevant part, provides:
 
 
 18
 A. The Secretary shall, subject to valid existing rights, convey, as soon as reasonably possible, the surface and subsurface estate in all public lands described in Appendix A to CIRI.
 
 
 19
 B. CIRI shall reconvey the surface estate of such lands to the Village Corporations within the Region pursuant to an agreement between CIRI and the affected Village Corporations, which agreement is attached as Appendix B to this agreement and which agreement may be modified by the parties thereto.
 
 
 20
 C. To the extent the lands conveyed pursuant to paragraph A when added to lands otherwise heretofore received or to be received by such Village Corporations are insufficient to satisfy their statutory entitlement, the Secretary shall, for the purpose stated in paragraph B, convey subject to valid existing rights to Cook Inlet Region, Inc., such additional lands from Appendix C as are necessary to fulfill such entitlement, except to the extent conveyances of such land are inconsistent with the requirements of [the Terms and Conditions statute] and this paragraph C. Conveyances by the Secretary under this paragraph C shall be made from the lands therein listed in Appendix C and in the order therein listed until the requirements of this subsection are met.
 
 
 21
 * * * *
 
 
 22
 L. If the provisions of [the Terms and Conditions statute] take effect, the following lands, which are also described in Appendix C to this agreement, shall only be conveyed to CIRI where there are Section 12(a) selections on file with the Bureau of Land Management, December 18, 1974, within such lands or where the provisions of [the Terms and Conditions Statute] permit conveyance.
 
 
 23
 * * *
 
 
 24
 (ii) lands ... generally known as the Chinitna Peninsula....
 
 
 25
 Deficiency Agreement (emphasis added).
 
 
 26
 The agreement between CIRI and the Villages referred to in paragraph B was entitled "12(a) Conveyance Agreement." It provided that, once CIRI received land from the federal government, it would distribute that land to the Villages in the order in which they had made their section 12(a) selections. In other words, the Villages' previous selection by rounds would govern the manner in which they would receive their land from CIRI. Interior was not a party to this conveyance agreement.
 
 
 27
 In order to permit the Deficiency Agreement to be carried out, Congress enacted Pub.L. No. 94-456, 90 Stat.1935, 43 U.S.C. § 1611 note (1976). Among other things, it stated:
 
 
 28
 (a) The Secretary is authorized to convey lands under application for selection by Village Corporations within Cook Inlet Region to the Cook Inlet Region, Incorporated, for reconveyance by the Region to such Village Corporations. Such lands shall be conveyed as partial satisfaction of the statutory entitlement of such Village Corporations of lands withdrawn pursuant to [ANCSA].... For the purposes of counting acres received in computing statutory entitlement, the Secretary shall count the number of acres or acre selections surrendered by Village Corporations in any exchange for any other lands or selections.
 
 
 29
 Id., at § 4.
 
 F. The Present Dispute
 
 30
 In accordance with their § 12(a) Conveyance Agreement with CIRI, the Villages believed that under the Deficiency Agreement, they would receive their lands in the same order and priority as they had made in their round of 12(a) selections. Although many of the Villages' 12(a) selections involved lands listed in Appendix A of the Deficiency Agreement, others of their 12(a) selections involved lands listed in Appendix C of the agreement.
 
 
 31
 In 1982, after CIRI had conveyed the Villages' higher priority 12(a) selections contained in Appendix A, it requested that Interior convey the land next on the list of the Villages 12(a) selection priorities, so that it could reconvey it to the Villages. These lands, comprising approximately 29,000 acres of the Chinitna Peninsula, are listed in Appendix C of the Deficiency Agreement and are the subject of the current dispute.
 
 
 32
 Initially, at least some responsible Interior officials believed that Interior could convey the land according to paragraphs B and L of the Deficiency Agreement, because those lands were next on the list of the Villages 12(a) selection priorities. Interior conducted further review over the course of several years, and finally, in 1991, it formally notified CIRI that it was not entitled to receive the lands in question because they were contained in Appendix C and there was land remaining in the Appendix A group. CIRI protested, and Interior's position was upheld by an opinion of the Solicitor in 1994 that was adopted by the Assistant Secretary for Lands and Minerals Management. Because there is no dispute today that the lands described in Appendix A are sufficient in quantity to provide all the acreage to which the Villages are entitled under section 12(a) and section 12(b), Interior's interpretation of the Deficiency Agreement means that the Villages will receive none of their selections of Appendix C lands — notably those in the Chinitna Peninsula.
 
 
 33
 The dispute was brought to the attention of Congress, which authorized CIRI and the Villages to bring an action in the District Court for the District of Alaska to contest Interior's ruling that CIRI and the Villages would receive no lands listed in Appendix C of the Deficiency Agreement. Omnibus Parks and Public Lands Management Act of 1996, Pub.L. No. 104-333, § 1034, 110 Stat. 4093, 4240 (1996), as amended by Pub.L. No. 105-83, § 121, 111 Stat. 1543 (1977). The Act provided that, "if litigation is commenced, at the court trial, any party may introduce any relevant evidence bearing on the interpretation of the 1976 agreement." Id.
 
 
 34
 CIRI and the Villages both sued, and the district court consolidated the cases. The district court denied the parties' cross-motions for summary judgment, stating that clauses of the Agreement appeared to conflict regarding whether land from Appendix C could be conveyed before exhaustion of the Appendix A lands. The court accordingly ordered trial to proceed for the purpose of examining extrinsic evidence in order to ascertain the intended meaning of the Agreement. Following an eight-day bench trial in which many of the participants in the drafting of the Deficiency Agreement testified, the district court ruled that the language of the Agreement was unambiguous and that, according to its plain meaning, Interior could convey lands from Appendix C only if the lands from Appendix A proved insufficient to meet the Villages' statutory entitlements. Because the lands from Appendix A were sufficient to meet those entitlements, the district court rejected the Villages' claims and ruled in favor of the government. The Villages and CIRI now appeal.
 
 II.
 A. Standard of Review
 
 35
 Federal law governs the interpretation of contracts entered pursuant to federal law where the federal government is a party. See O'Neill v. United States, 50 F.3d 677, 682(9th Cir.1995). The determination whether a contract is ambiguous is a question of law that we review de novo, see id., but we review only for clear error the district court's underlying findings of fact. See DP Aviation v. Smiths Indus. Aerospace & Def. Syst., Ltd., 268 F.3d 829, 836 (9th Cir.2001).
 
 
 36
 Interior argues that, because it is the Agency responsible for administering ANCSA, we should defer to its interpretation of contracts made under ANCSA if the interpretation is reasonable. It is true that we have held that Interior's interpretations of ANCSA are entitled to deference that carries more weight than the canon of construction that ambiguous statutes are to be interpreted in favor of Native Americans. See, e.g., Williams v. Babbitt, 115 F.3d 657, 663 n. 5 (9th Cir.1997); Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1342(9th Cir.1990) (applying Chevron deference to Interior's interpretation of ANCSA). Here, however, Interior is not interpreting ANCSA but a separate agreement entered into by CIRI and Interior. Although ANCSA may have provided the context for the agreement, the Deficiency Agreement neither calls for Interior to interpret ANCSA in any way nor to use its expertise in its understanding of that statute. In addition, as an interested party to the Deficiency Agreement that stands to gain or lose depending on the outcome of this litigation, the agency should not be accorded any deference. See Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 614 (D.C.Cir.1992). Thus, we need not defer to Interior's interpretation of the Deficiency Agreement.
 
 B. The Deficiency Agreement
 
 1. The Plain Language
 
 
 37
 The primary issue in this case is whether the Deficiency Agreement requires that land conveyances from the federal government to CIRI must come from Appendix A before any can come from Appendix C or, alternatively, whether it requires that conveyances to CIRI must be made in the order of the Villages' 12(a) selection priorities regardless of whether those lands are contained in Appendix A or Appendix C. The Villages do not appear to argue that their interpretation of the Deficiency Agreement is the only reasonable interpretation, but instead argue that the contract is ambiguous. They then argue that we should follow the canon of construction that ambiguous terms in statutes and treaties concerning Native Americans, including Native Alaskans, should be construed in their favor. See United States v. Gila Valley Irrigation Dist., 31 F.3d 1428, 1438 (9th Cir.1994) (explaining the canon); but see United States v. Atlantic Richfield Co., 612 F.2d 1132, 1139 (9th Cir.1980) (rule of favorable construction may operate with less force in modern day when Natives are represented by illustrious counsel).
 
 
 38
 We conclude that the unambiguous language of the Deficiency Agreement precludes the conveyance of Appendix C lands if the lands conveyed in Appendix A are sufficient in quantity to satisfy the acreage entitlements of the Villages. We are unable to construe in any other manner the provision that lands in Appendix C can be conveyed "to the extent the lands conveyed pursuant to paragraph A when added to lands otherwise heretofore received by such Village Corporations are insufficient to satisfy their statutory entitlement...." We also agree with the district court that the evidence presented by the parties does not indicate a mutual intent contrary to the plain meaning of the Deficiency Agreement.[4]
 
 
 39
 
 2. "Statutory Entitlement"
 
 
 
 40
 The Villages argue that paragraph C's language indicating that Appendix C lands would be conveyed only if Appendix A lands were "insufficient to satisfy their statutory entitlement" is ambiguous because the term "statutory entitlement" could refer either (1) to the Villages' entitlement under ANCSA to a specified quantity of acreage or (2) to the Villages' entitlement to receive their 12(a) selections in the order that they made them. Here, again, we find no ambiguity; the Agreement clearly uses "statutory entitlement" as in (1) above. Section D of the Agreement provides:
 
 
 41
 For the purposes of counting acres received in computing statutory entitlement under paragraphs B and C the Secretary shall count the number of acres surrendered by Village Corporations in any exchange for any other lands or selection rights, not the number of acres received in such exchange.
 
 
 42
 Deficiency Agreement, § D. This passage makes sense only if "statutory entitlement" refers to the total number of acres allowed a particular Village. Virtually the same language was repeated in the implementing act passed by Congress four days after the Deficiency Agreement was concluded. Pub.L. No. 94-456, § 4(a). Moreover, ANCSA itself refers to "acreage" or "number of acres" to which a village is "entitled." See, e.g., 43 U.S.C. §§ 1611(a) and (c), 1613(a). Interior's regulations do the same. See, e.g., 43 C.F.R. §§ 2650.5-1(b), 2651.1, 2651.4(a).
 
 
 43
 There is another difficulty with the Villages' interpretation of "statutory entitlement" to mean the Villages' section 12(a) selections rather than a maximum acreage. Because of uncertainties regarding the availability of some of the withdrawn land, the Villages were permitted to overselect. If their selections as made are their entitlement, then their entitlement exceeds the total allowable acreage under ANCSA. In addition, the Villages are allowed to change their order of priorities, which means that the selections involve considerable uncertainty prior to actual conveyance. See Seldovia Native Ass'n, Inc. v. United States, 144 F.3d 769, 781-82 (Fed. Cir.1998). For both literal and practical reasons, therefore, we reject the Villages' contention concerning the meaning of "statutory entitlement."
 
 
 3. Paragraph B
 
 
 44
 The Villages' most forceful argument concerns the apparent inconsistency between paragraphs B and C of the Deficiency Agreement. Paragraph B requires CIRI to convey land to the Villages pursuant to the attached 12(a) Conveyance Agreement between CIRI and the Villages. That agreement specifies that land will be conveyed in the order that the section 12(a) selections were made by the Villages. Yet that goal cannot be accomplished: Paragraph C requires the Villages to forego their Appendix C selections because there is land remaining in Appendix A which they can select.
 
 
 45
 Although this contention has its appeal, the inconsistency between paragraphs B and C is more apparent than real. First, at the time (1976) that the Deficiency Agreement was entered, it was entirely possible, even likely, that the Appendix A lands would not be sufficient to fulfill the Villages' section 12(a) entitlements. Alexander Creek, which was later found ineligible, was seeking to qualify as a village. A large block of so-called state "Mental Health Lands" that had been selected by the Villages was believed to be unavailable for conveyance; that view prevailed until this court decided to the contrary in 1988. See Tyonek Native Corp. v. Sec'y of the Interior, 836 F.2d 1237 (9th Cir.1988). If these contingencies had been resolved a different way, the Appendix A lands would have been insufficient and the Villages would have been able to pursue their selections in Appendix C (although not in the order they chose).
 
 
 46
 There are additional reasons that compel us to read the Deficiency Agreement as Interior does: that is, as an agreement between CIRI and Interior that determines, in paragraphs A and C, what land can be conveyed to CIRI and under what circumstances. The attached agreement between CIRI and the Villages, in that view, does not bind the government. The first reason was noted by the district court: paragraph B describes the attached agreement as one between CIRI and the Villages, to which the federal government is not a party. The agreement is "attached," not incorporated. Moreover, paragraph B states that the agreement between CIRI and the Villages "may be modified by the parties thereto." It is not a reasonable construction of the Deficiency Agreement that an attached agreement to which the federal government is not a party, and which can be changed without the government's participation, would bind the government.
 
 
 47
 Our view is supported by testimony of several of the Deficiency Agreement's negotiators that they believed that paragraph B governed only the relationship between CIRI and the Villages. Federal negotiators testified that they believed that paragraphs A and C, not paragraph B, set out the operational mechanism for land distribution to CIRI. That distribution scheme necessarily controlled to the extent of its terms the distribution to the Villages because CIRI could not convey what it did not receive from the federal government. The negotiators expected, therefore, that in case of a conflict between the paragraph C priorities and the Villages' original 12(a) selection priorities, paragraph C would control. Indeed, federal negotiators testified that they were not shown the Conveyance Agreement until late in the Deficiency Agreement's drafting process, and were not concerned particularly with its contents because it related only to the disposition of land after the federal government conveyed it according to the terms of paragraph A and, if necessary, paragraph C. This testimony is consistent with much other evidence of the negotiations. The district court found the negotiators' testimony persuasive in supporting the plain language of paragraph C, and we see no reason to disagree.
 
 
 48
 Moreover, paragraph C of the Deficiency Agreement provides that, if Appendix C lands must be conveyed (because Appendix A lands are insufficient to fulfill the Villages' entitlement), then they will be conveyed in the order set forth in Appendix C. This provision is consistent with the special solicitude for potential park lands that was reflected both in the Terms and Conditions and in the negotiations leading to the Deficiency Agreement. It is not consistent with an intention that the government be required to convey land in accordance with the attached agreement between CIRI and the Villages, which included selections deviating greatly from the order of priorities set out in paragraph C and Appendix C.
 
 
 49
 
 4. Practical Construction and Denial of Summary Judgment
 
 
 
 50
 The Villages contend that the Deficiency Agreement must be ambiguous because officials of the BLM originally took the same view as the Villages regarding selections from Appendix C. But mistaken views about an unambiguous agreement do not create ambiguity. See In re Chicago & E.I. Ry. Co., 94 F.2d 296, 299-300 (7th Cir.1938); 11 Richard A. Lord, Williston on Contracts § 32:14 at 501 (4th ed.1999). Nor is ambiguity established by the fact that the district court denied summary judgment, and concluded only after trial that the Agreement was unambiguous. The district court originally noted the apparent conflict between paragraphs B and C of the Agreement, but was entitled to conclude, as we do, that there is no ambiguity concerning the Agreement's mandate for government conveyance of land to CIRI. We note as well that the district court observed that the modern trend is to admit extrinsic evidence to aid in determining the common meaning of the parties to an agreement even in the absence of ambiguity. See O'Neill v. United States, 50 F.3d 677, 684 (9th Cir.1995). We reject the contention that the district court's careful approach to the meaning of the Agreement demonstrates ambiguity.
 
 
 51
 
 5. Consistency with the Terms and Conditions; Paragraph L of the Deficiency Agreement
 
 
 
 52
 Contrary to the contention of the Villages, there is no inconsistency between the Terms and Conditions and our interpretation of the Deficiency Agreement. It is true that Sections VIIB and VIIIA of the Terms and Conditions refer to section 12(a) selections in the Chinitna Peninsula and suggest a future voluntary exchange to support an expanded Lake Clark Park. But nothing in the Terms and Conditions required those section 12(a) selections to mature to conveyance. If they had so ripened (as they well might have if the lands of Appendix A of the Deficiency Agreement had been inadequate to fulfill the Villages' entitlements), then the prospect of voluntary exchanges is perfectly meaningful. On the other hand, there could be no way of knowing for certain at the time the Terms and Conditions were solidified whether the section 12(a) selections in the Chinitna Peninsula were even valid (or perhaps were part of the Villages' overselection). Nothing in the Terms and Conditions, therefore, precludes the Deficiency Agreement from being interpreted in present circumstances to preclude section 12(a) selections in the Appendix C area.
 
 
 53
 The same may be said of paragraph L of the Deficiency Agreement, which was added at the last moment apparently in an attempt to demonstrate consistency with the Terms and Conditions. Paragraph L provides, among other things, that lands within the Chinitna Peninsula "shall only be conveyed to CIRI where there are Section 12(a) selections on file with the Bureau of Land Management, December 18, 1974...." This restriction is consistent with the Terms and Conditions, which reflected the desire of the federal government not to permit conveyance of land in Chinitna Peninsula except as a section 12(a) selection. But paragraph L, like the Terms and Conditions, does not mandate any such conveyances. It allows them, if otherwise permitted. Had the Appendix A lands been insufficient for the Villages' entitlement, these section 12(a) conveyances (subject to paragraph C ordering) would have been made in Chinitna Peninsula. Paragraph L accordingly does not conflict with, or otherwise nullify the plain words of, paragraph C of the Agreement.
 
 
 6. Canons of Construction
 
 
 54
 Because we conclude that the Deficiency Agreement is unambiguous, there is little room for operation of the canon favoring construction of agreements liberally in favor of Native Americans. See United States v. Washington, 759 F.2d 1353, 1358 (9th Cir.1985) (en banc). The canon may not be used to avoid a contract's plain language. See Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943) ("But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."); see also Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) (observing that the principle of resolving ambiguities in favor of Indians does not permit courts to ignore plain language). Because the plain language of the Deficiency Agreement requires exhaustion of Appendix A lands prior to conveyance of Appendix C lands, even a liberal construction of the agreement does not permit us to adopt the Villages' interpretation. Nor does our investigation of the history and negotiations of the Deficiency Agreement dictate a contrary result. See Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). Because application of the canon would yield a result at odds with the clear meaning of the Deficiency Agreement, we decline to apply it here.
 
 C. Ninilchik
 
 55
 The Villages argue that the Ninilchik Village Corporation is entitled to receive lands from Appendix C because it has no more 12(a) selections among the lands listed in Appendix A. Thus, although there are lands in Appendix A that remain to be conveyed, Ninilchik argues that it is entitled to receive its original 12(a) selections contained in Appendix C rather than substitute land from Appendix A.[5]
 
 
 56
 Ninilchik's situation is simply an enactment of the operation of the Deficiency Agreement as interpreted by Interior and confirmed by us. Because Ninilchik is further along in the process than the other Villages, all of its section 12(a) selections in Appendix A have been conveyed. It has not fulfilled its entitlement and it made section 12(a) selections in Section C lands. Because there are Appendix A lands available, it cannot resort to Appendix C and must fulfill its section 12(a) entitlements from Appendix A land not subject to other Villages' section 12(a) selections. Everything we have said thus far compels this conclusion.
 
 
 57
 D. The Secretary's Authority to Convey Lands in Appendix C
 
 
 58
 The Villages argue that, even if Interior was not required to convey Appendix C lands to the Villages according to their original 12(a) priorities, the district court erred in determining that Interior lacked the authority to convey those lands. This point is no longer of consequence, however, in light of our determination that the Secretary has properly interpreted the Deficiency Agreement.
 
 
 59
 In 1976, when the Deficiency Agreement was reached, the Agreement could not be implemented without congressional approval because ANCSA did not permit the Secretary to convey land selected after the statutory deadline or land that did not meet statutory selection requirements. After the Deficiency Agreement was reached, Congress enabled its performance in a provision of Public Law 94-456 that stated: "The Secretary is authorized to convey lands under application for selection by Village Corporations within Cook Inlet Region to the Cook Inlet Region, Incorporated, for reconveyance to such Village Corporations." Pub.L. No. 94-456, 90 Stat.1934, § 4 (1976). The Villages argue that this provision explicitly authorizes the Secretary to convey to the Villages, via CIRI, their original 12(a) selections, regardless of whether they are listed in Appendix A or Appendix C of the Deficiency Agreement.
 
 
 60
 The purpose of the quoted statutory provision was to permit the Secretary to carry out the provisions of the Deficiency Agreement, which had been entered a mere four days before the enactment of the statute. The statute was broadly worded to permit the Secretary to convey land that he otherwise would have been unable to convey. If the Deficiency Agreement had been worded to require conveyance of all section 12(a) lands just as the Villages had selected them, the statute was written broadly enough to permit the Secretary to convey those lands. The statute authorizes, however; it does not command. It certainly does not command the Secretary to breach the provisions of the Deficiency Agreement, the performance of which the statute was designed to enable.
 
 
 61
 We need not decide, therefore, whether Public Law 94-456 authorized the Secretary to convey more broadly than the Deficiency Agreement required. The Deficiency Agreement bound the parties and specified the land to be conveyed by the Secretary to CIRI and the order of its conveyance. We cannot overturn the action of the Secretary in adhering to the Deficiency Agreement, even if the statute would have permitted the Secretary to convey in accordance with some other arrangement. The Villages' argument is therefore of no avail.
 
 III.
 
 62
 There is no question that the Villages feel strongly that they are entitled to their section 12(a) selections just as they made them. In their view, the Deficiency Agreement was simply a vehicle for fully accomplishing that goal. As the Solicitor of Interior pointed out, however, the Deficiency Agreement could have been much more simply written if the only goal was to effectuate all of the Villages' selections just as they made them. The District Court concluded, after trial, that the evidence supported the plain language of the Agreement as a compromise measure that preserved some, but not all, of the Villages' selections, while ensuring that the Villages received their full acreage entitlement. The district court also concluded, correctly in our view, that the unambiguous language of the Agreement controlled the government's conveyances to CIRI, and precluded conveyance of Appendix C lands when there were still lands available in Appendix A.
 
 The judgment of the district court is
 
 63
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 ANCSA provides that villages are to receive title to the surface estate in the lands they selected. The subsurface (mineral) estate is conveyed to the regional corporation. 43 U.S.C. § 1613(f)
 
 
 [2]
 In fact, each Village ended up with four lists after four complete draft rounds, in order to account for all possibilities regarding the doubtful eligibility of Salamatoff and Alexander Creek. Because Salamatoff was later found eligible as a village and Alexander Creek was not, the second alternative round (Round B) became the operative one
 
 
 [3]
 The state of Alaska also had interest in the lands in question, but their interest is not relevant to the present dispute
 
 
 [4]
 The district court correctly ruled that reformation of the Deficiency Agreement was not appropriate because there was no showing that the parties agreed on a meaning contrary to that embodied in its plain wordsSee North Star Alaska v. United States, 14 F.3d 36, 37 n. 1 (9th Cir.1994).
 
 
 [5]
 There are available lands within Appendix A that Ninilchik selected in the alternative rounds that were based on contingencies that did not occur. The operative selection round, however, was Round B, and Ninilchik has exhausted its Round B section 12(a) selections in the Appendix A lands