**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: IMPERIAL CREDIT INDUSTRIES,
INC., a California corporation,
                            *Debtor.*

EDWARD M. WOLKOWITZ, as
Trustee for Imperial Credit
Industries, Inc.,
                 *Plaintiff-Appellant,*

            v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate
capacity,
                 *Defendant-Appellee.*

No. 05-56073

D.C. No.
CV-03-08627-JVS

6293

In the Matter of: Imperial Credit Industries, Inc., a California corporation,

Debtor.

Imperial Credit Industries, Inc.,
Plaintiff,

and

Edward M. Wolkowitz, as Trustee for Imperial Credit Industries, Inc.,
Plaintiff-counter-defendant-Appellant,

v.

FDIC, in its capacity as receiver for Southern Pacific Bank,
Defendant-Appellee.

Federal Deposit Insurance Corporation, in its corporate capacity,
Defendant-counter-claimant-Appellee.

No. 06-56763

D.C. No.
CV-03-08627-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
February 6, 2008—Pasadena, California

Filed June 4, 2008

Before: Cynthia Holcomb Hall, Susan P. Graber, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Hall

**COUNSEL**

Michael H. Strub, Jr., Irell & Manella, Los Angeles, California, for the plaintiff-appellant.

Jaclyn C. Taner, Jennifer M. Barozie, and J. Scott Watson, Federal Deposit Insurance Corporation, Legal Division, Arlington, Virginia, for the defendant-appellee.

**OPINION**

HALL, Circuit Judge:

These companion cases concern the undercapitalization and eventual insolvency of a federally insured bank, Southern Pacific Bank (SPB), and its holding company, Imperial Credit Industries (Imperial). In February 2002, the Federal Deposit Insurance Corporation (FDIC) notified SPB that it was undercapitalized and required it to submit a capital restoration plan. SPB submitted a capital plan as well as a guaranty from Imperial that SPB would perform under the plan. SPB failed to implement its capital plan, and the FDIC demanded that

Imperial pay its $18,375,800 obligation under the guaranty. Imperial, by that point in Chapter 11, asserted a number of defenses to its obligation under the performance guaranty. The district court rejected all of these defenses and granted partial summary judgment in favor of the FDIC, ruling that section 365(o) of the Bankruptcy Code required Imperial to cure its deficit to the FDIC as a condition of remaining in Chapter 11. On appeal from that order, Imperial's Trustee, Edward M. Wolkowitz (Wolkowitz or the Trustee), challenges not only whether the performance guaranty binds Imperial with respect to SPB's capital plan, but also whether Imperial's liability under the guaranty was properly calculated and whether the performance guaranty may be avoided as a fraudulent conveyance. We affirm the district court's conclusion that Imperial is bound by the performance guaranty and its calculation of Imperial's liability, but reverse and remand the fraudulent conveyance claim for further proceedings.

While the above appeal was pending, Imperial converted to Chapter 7 to avoid the district court's order that it immediately cure its deficit pursuant to 11 U.S.C. § 365(o). The FDIC filed a counterclaim for declaratory relief in the district court, seeking a determination of the priority of Imperial's obligation under the performance guaranty. The district court granted summary judgment in favor of the FDIC, holding that the FDIC's claim was entitled to administrative priority status under 11 U.S.C. § 507(a)(2). The Trustee appeals that decision as well, arguing that the FDIC's claim is entitled only to ninth priority under 11 U.S.C. § 507(a)(9). We agree and, therefore, reverse the district court's grant of summary judgment in favor of the FDIC on this issue.

## I.   FACTS AND PROCEDURAL HISTORY

In February 2002, the FDIC issued a Prompt Corrective Action notice informing SPB that it was undercapitalized and requiring SPB to submit a capital restoration plan by March

1, 2002, to avoid further restrictions on its activities.[1] On March 1, 2002, SPB filed a capital restoration plan (the March 1 capital plan or March 1 plan), which called for it to raise approximately $55 million in new capital through the sale of common equity by June 30, 2002. Pursuant to federal law, on February 27, 2002, SPB's holding company, Imperial, executed a corresponding guaranty that SPB would perform under the plan.[2] The performance guaranty was attached as an exhibit to SPB's March 1 capital restoration plan.

The text of the performance guaranty begins with several recitals, including the following:

> On February 1, 2002, [SPB]'s Board of Directors received a Prompt Corrective Action notification letter from the [FDIC] which, among other things, requires [SPB] to file a written capital restoration plan (the 'Capital Plan') with the regional office of the [FDIC] by March 1, 2002 . . . .

> The Guaranty set forth below has been duly adopted at the regular meeting of the Board of Directors of [Imperial] held on February 27, 2002 and is intended to comply fully with Section 38 of the Federal Deposit Insurance Act and the implementing regulations thereto.

After these recitals, the document sets forth the substantive terms of the performance guaranty, by which Imperial commits itself to:

---

[1]A federally insured bank must submit an acceptable capital restoration plan in response to a Prompt Corrective Action notice. Otherwise, the bank becomes subject to significant restrictions on its activities. 12 U.S.C. § 1831o(e)(2) & (f)(1)(B)-(2).

[2]Any company controlling an undercapitalized bank must guarantee the performance of the bank's capital plan. 12 U.S.C. § 1831o(e)(2)(C)(ii).

absolutely, unconditionally and irrevocably guarantee[ ] the performance of [SPB] under the terms of the Capital Plan and . . . pay the sum demanded to [SPB] or as directed by the [FDIC] in immediately available funds promptly after receipt by [Imperial] of such demand; provided, that the aggregate liability of [Imperial] under this Guaranty shall be the lesser of an amount equal to five percent (5%) of [SPB]'s total assets as of December 31, 2001 or the amount which is necessary or would have been necessary to restore the relevant capital measures of [SPB] to the levels required to be 'adequately' capitalized, as those measures and levels are defined at the time that [SPB] initially fails to comply with its approved Capital Plan . . . .

The FDIC did not approve the March 1 plan. SPB submitted revised capital restoration plans on April 12, 2002, and May 9, 2002, which the FDIC rejected as well. On May 24, SPB submitted an amendment to the May 9 plan (the May 24 capital plan or May 24 plan), which proposed a capital infusion of approximately $55 million by July 22, 2002, this time through private placement and/or the sale of assets. Unlike the March 1 plan, the plans submitted on April 12, May 9, and May 24 did not include as an attachment any performance guaranty by Imperial. Nonetheless, the FDIC approved the May 24 plan.

SPB failed to implement its capital restoration plan by the July 22, 2002, deadline. On July 25, 2002, the FDIC issued a second Prompt Corrective Action notice, informing SPB that it would be subject to the restrictions imposed on a "significantly undercapitalized institution" under 12 U.S.C. § 1831o(f). Both Imperial and SPB attempted to achieve a recapitalization of SPB — with Imperial transferring $5 million in cash to SPB on March 31, 2002, and July 31, 2002 — but on February 7, 2003, the California Department of Financial Institutions declared SPB insolvent and appointed the

FDIC as receiver. On July 17, 2003, Imperial filed a voluntary petition under Chapter 11 of the Bankruptcy Code, seeking to liquidate its assets.

On September 4, 2003, the FDIC notified Imperial that it had failed to comply with its performance guaranty and demanded $18,375,800 under the contract. On November 6, 2003, Imperial filed an adversary action against the FDIC in the Bankruptcy Court for the Central District of California, seeking to avoid the alleged obligation. The case was transferred to the District Court for the Central District of California, and on March 25, 2004, Imperial filed its Second Amended Complaint, asserting eight causes of action against the FDIC. The FDIC moved to dismiss all the claims except the claims for declaratory relief and judgment. The district court denied the FDIC's motion with respect to Imperial's equitable subordination claim and allowed Imperial to replead its fraudulent inducement and conveyance claims, but otherwise granted the FDIC's motion.[3] Imperial amended its complaint and repled its fraudulent conveyance claim on November 12, 2004, but the district court once again granted the FDIC's motion to dismiss that claim, ruling that Imperial had failed to plead actual fraud.

On December 13, 2004, the FDIC moved for an order requiring Imperial to pay its obligation under the performance guaranty pursuant to 11 U.S.C. § 365(o), which provides that Chapter 11 debtors must "immediately cure" any deficit owed to a Federal depository institutions regulatory agency under a capital maintenance commitment. The court ruled on the FDIC's motion on February 15, 2005. It held that if Imperial had guaranteed SPB's capital restoration plan, it was required to cure any capital deficit of SPB as a condition of remaining

---

[3]The court held that Imperial's fraudulent conveyance claim was barred by 12 U.S.C. § 1828(u) unless Imperial could plead actual fraud pursuant to § 1828(u)(2). It allowed Imperial leave to replead those claims and establish actual fraud.

in Chapter 11. However, the court delayed a final ruling on the FDIC's motion because Imperial was entitled to present "obligor" defenses to the contractual obligation, which had not been fully briefed. The court found that five of Imperial's claims from its Second Amended Complaint were "obligor" defenses, and granted it leave to present those. Two of Imperial's claims — its equitable subordination and fraudulent conveyance claims — were "trustee" defenses; the court held that Imperial could not bring those claims until it obtained Chapter 11 trustee status by curing its deficit. Imperial's fraudulent conveyance claim was moot regardless of its status as a "trustee defense," though, because that claim had been dismissed on separate grounds.

On April 4, 2004, the FDIC moved for partial summary judgment to enforce Imperial's deficit. On June 15, 2005, the district court granted the motion, rejecting all five of Imperial's "obligor" defenses. The court then entered an appealable final partial judgment for the FDIC pursuant to Federal Rule of Civil Procedure 54(b) on July 6, 2005, ordering Imperial to pay the sum of $18,375,800 to the FDIC within 30 days. The court stated that if Imperial converted to Chapter 7, Imperial would be relieved of its obligation to immediately pay $18,375,800 to the FDIC, and that its "unsatisfied immediate cure obligation shall have the status and priority in the Chapter 7 case which it is accorded under applicable bankruptcy law."

Imperial filed a notice of appeal from the district court's summary judgment on July 15, 2005, and unsuccessfully sought a stay from the district court and this court. Less than a month later, Imperial converted its case to Chapter 7, thereby avoiding its obligation to pay the $18,375,800 immediately.

In the Chapter 7 case, the FDIC moved for a declaration that Imperial's cure obligation was entitled to priority administrative expense status under 11 U.S.C. § 507(a)(2). The dis-

trict court granted partial summary judgment in favor of the FDIC on this issue on October 6, 2006. The parties stipulated to the dismissal of all remaining claims in the action, and judgment was entered in favor of the FDIC on November 28, 2006. Imperial's timely appeal followed.

## II.   DISCUSSION

The district court's grants of summary judgment in favor of the FDIC are reviewed *de novo*, under the same standards applied by the district court. "We must determine whether, viewing the evidence in the light most favorable to the non-moving party, any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997).

We also review *de novo* the district court's dismissal of the fraudulent conveyance claim. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Dismissal is proper only "if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.*

### A.   *Imperial guaranteed SPB's May 24 Capital Plan*

In its partial summary judgment ruling in favor of the FDIC, the district court held that the performance guaranty signed by Imperial on February 27, 2002, applied to the May 24 capital plan approved by the FDIC. On appeal, the Trustee reiterates its argument that Imperial guaranteed only the March 1 capital plan.

**[1]** The parties agree that the ordinary rules of contract interpretation apply to the performance guaranty under California law. *See Cent. Bldg.*, *LLC v. Cooper*, 26 Cal. Rptr. 3d 212, 216 (Ct. App. 2005); Cal. Civ. Code § 2837. As with any contract, our goal is to give effect to the mutual intent of the parties. *County of San Diego v. Ace Prop. & Cas. Ins. Co.*,

118 P.3d 607, 612 (Cal. 2005) (citing *Bank of the W. v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992). Mutual intent is determined by "the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." *Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 660 (Ct. App. 2004) (internal quotation mark omitted) (citing Cal. Civ. Code §§ 1635-1656; Cal. Civ. Proc. Code §§ 1859-1861, 1864); *see also Bank of Am. Nat'l Trust & Sav. Ass'n v. Waters*, 26 Cal. Rptr. 9, 11 (Ct. App. 1962).

Based on our examination of the language of the contract, the circumstances surrounding its negotiation and execution, and the subsequent conduct of the parties, we hold that the performance guaranty is valid and enforceable with respect to SPB's May 24 capital plan. The guaranty must be read in conjunction with the statute and regulations that required its execution in the first place, and such a reading necessarily leads to the conclusion that the parties intended it to apply to the capital plan ultimately approved by the FDIC.

**[2]** The statutes governing the undercapitalization of federally insured depository institutions directed the course of events in this case. SPB received a Prompt Corrective Action notice from the FDIC, and was required under 12 U.S.C. § 1831o(e)(2) to submit a capital restoration plan to the FDIC in order to avoid restrictions on its activities. 12 U.S.C. § 1831o(e)(2) & (f). Section 1831o(e)(2)(C)(ii) required Imperial, as SPB's holding company, to guaranty SPB's performance under the capital plan. Imperial submitted a performance guaranty with SPB's March 1 capital plan to comply with the statute. The guaranty explicitly recognized its role in SPB's recapitalization process, stating that section 38 of the Federal Deposit Insurance Act and the Act's implementing regulations require a "company that controls an undercapitalized bank [to] issue a performance guaranty with respect to

the company's capital restoration plan." *See* 12 U.S.C. 1831o(e)(2)(C)(ii); 12 C.F.R. § 325.104. The performance guaranty also stated that it "intended to comply fully with Section 38 of the Federal Deposit Insurance Act and the implementing regulations thereto."

After the FDIC failed to accept SPB's March 1 capital plan, SPB submitted three other versions of capital restoration plans to the FDIC over the course of a few months in an effort to regain adequately capitalized status and avoid restrictions on its activities. According to Imperial, during this time it "worked diligently with SPB to comply with all FDIC directives in an effort to achieve recapitalization."[4] The FDIC finally approved the fourth version of SPB's capital plan, which was submitted on May 24, with no objection from SPB or Imperial.

The Trustee now contends that Imperial never intended its previously offered guaranty to apply to the May 24 version of the capital plan. This argument not only belies the guaranty's promise to comply with the statutes and regulations directing the treatment of undercapitalized banks, but also is inconsistent with Imperial's subsequent efforts to achieve SPB's recapitalization. The language of the performance guaranty clearly demonstrates that Imperial intended to comply with the statutory framework governing undercapitalized institutions. Imperial was fully aware that an enforceable performance guarantee was required in order for the FDIC to approve SPB's capital plan, and it worked with the FDIC and SPB in an effort to achieve SPB's recapitalization.

**[3]** Moreover, Imperial implicitly recognized that its guaranty would extend to a later version of SPB's capital plan. The performance guaranty defined Imperial's liability with

---

[4]This quote is from Imperial's Second Amended Complaint against the FDIC. Imperial now seems to deny any efforts to obtain the FDIC's approval of the May 24 capital plan, but the complaint suggests otherwise.

reference to the "approved" capital plan, rather than the March 1 capital plan, and it fixed a maximum amount of liability at 5% of SPB's assets on December 31, 2001, regardless of the form the approved plan ultimately took. Thus, the Trustee cannot successfully argue that Imperial never intended to guaranty the May 24 plan.

The Trustee's arguments to the contrary fail to persuade us. For example, Wolkowitz argues that a "plain reading" of the performance guaranty demands the result that the guaranty only applied to the March 1 plan because the words "March 1, 2002" appear after the term "Capital Plan" in the guaranty. However, the words "March 1, 2002" are part of an earlier descriptive sentence, and not part of the substantive terms of the guaranty itself. The substantive terms of the guaranty apply to the "approved capital plan" without limitation.

Wolkowitz also contends that the guaranty never became an operative contract because it was submitted to the FDIC only as part of the March 1 capital plan, which the FDIC did not accept. This argument also fails. The rejection of the March 1 capital plan by the FDIC did not apply to the performance guaranty, which explicitly extended to the "approved Capital Plan" and not the March 1 plan specifically. Moreover, absolute guaranties are binding without notice of acceptance in California.[5] *See* Cal. Civ. Code § 2795; *Kierulff & Ravenscroft v. Koping*, 94 Cal. App. 473, 475 (Dist. Ct. App. 1928) ("Section 2795 of the Civil Code, changes the rule announced in many cases, and provides that an absolute guaranty is binding upon the guarantor without notice of acceptance.").[6] The Trustee's remaining arguments, which focus on

___

[5]Imperial promised to "absolutely, unconditionally, and irrevocably guarantee[ ] the performance of [SPB]."

[6]Although California Civil Code section 2795 refers to sureties rather than guarantors, California law equates the two. *See* Cal. Civ. Code § 2787 ("The distinction between sureties and guarantors is hereby abolished. . . . A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another . . . .").

two pieces of extrinsic evidence in the record, also fail to convince us that the parties did not intend the guaranty to apply to the May 24 capital plan.[7]

**[4]** In sum, we hold that the performance guaranty applies to the May 24 capital plan and affirm the district court's grant of summary judgment on this issue.

*B.   The district court properly calculated the amount of the performance guaranty*

The district court adopted the FDIC's calculation of Imperial's deficit under the performance guaranty at $18,375,800. The Trustee argues 1) that the district court erred in relying on SPB's June 30, 2002 Call report data, because the guaranty required any liability be calculated as of July 22, 2002; and 2) that a $5 million payment it made to SPB on July 30, 2002, should reduce any liability under the guaranty.

---

[7]For example, the Trustee cites a Material Loss Review describing SPB's bankruptcy, which was prepared by the FDIC Office of Inspector General. The document includes a chronology of events, and the entry for May 24, 2002, states that "[the] FDIC accepts SPB's revised [May 24] capital plan . . . [Imperial] is to sign a performance guaranty for ensuring the capital plan is pursued and realized." This one line in a report on SPB's financial failure does not, as the Trustee argues, prove that the FDIC believed that the performance guaranty did not apply to the May 24 plan, especially when viewed in light of the FDIC's continuous negotiations with SPB in an effort to come to an agreement on an appropriate capital restoration plan.

The Trustee also cites a letter from the FDIC to SPB in February of 2003, in which the FDIC notified SPB that it had rejected a November 2002 capital plan that SPB had submitted. In the letter, the FDIC informed SPB that it should submit a revised capital plan, and include a performance guaranty from Imperial. This evidence does not bear on Imperial's guaranty of the May 24 plan, because the November 2002 plan was in response to a *new* Prompt Corrective Action notice issued after SPB failed to comply with the May 24 capital plan, not the same February 2002 Prompt Corrective Action notice that led to the development of the March 1 and May 24 capital plans.

*1.   Use of June 30, 2002 Call Report Data*

The Trustee contests the district court's calculation as improperly relying on SPB's June 30 Call report data. He argues that the plain language of the guaranty required the FDIC to calculate the amount of the obligation as of July 22, 2002. The FDIC counters that neither the performance guaranty nor the regulation it recites dictates the source from which the FDIC must draw its data, and therefore the district court properly held that the FDIC's use of the June 30, 2002 data was entitled to administrative deference.

The performance guaranty, in language nearly identical to the FDIC regulation, 12 C.F.R. § 325.104(h)(1)(i)(B), limited Imperial's liability to the lesser of 5% of SPB's assets as of December 31, 2001, or the amount necessary to restore SPB's relevant capital measures to the levels required for SPB to be adequately capitalized, "as those capital measures and levels are defined at the time that [SPB] initially fails to comply with its approved Capital Plan." It is undisputed that SPB initially failed to comply with the May 24 plan on July 22, 2002, the deadline by which it was to have raised $55 million. Accordingly, Wolkowitz argues that any liability on Imperial's part should have been calculated as of July 22, 2002.[8]

**[5]** As the FDIC argues, the Trustee conflates the words "defined" and "calculated." The performance guaranty and the regulation in question simply state that the definitions of the capital measures and levels based upon which the FDIC measures a bank's liability must be those in place at the time of the bank's failure. Neither the performance guaranty nor the regulation says anything about how Imperial's liability should be calculated, nor states that the calculation must occur as of the date SPB fails to comply with the plan.

---

[8]The parties agree that 5% of SPB's assets as of December 31, 2001, would be more than the amount necessary to adequately capitalize SPB when it failed to comply with its capital plan.

**[6]** As a result, the district court correctly held that the performance guaranty and the corresponding regulation failed to clearly define how Imperial's obligation should be calculated. Finding the contract and the identical regulation ambiguous, the district court granted deference to the FDIC's reasonable interpretation of its own regulation as authorizing it to calculate Imperial's obligation based on SPB's June 30, 2002 call report — the latest data in its possession. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

**[7]** The Trustee attacks the district court's deference to the FDIC's interpretation on a number of fronts, but we find his arguments unpersuasive. For example, the Trustee argues that because the performance guaranty was a contract, and not a regulation, agency deference was inappropriate. Though we have held that deference is not appropriate solely because "the contract signed by the parties contains the same language as [a statute]," *Clay Tower Apts v. Kemp*, 978 F.2d 478, 480 (9th Cir. 1992), we agree with the district court that deference is proper here, because the agreement in question "stemmed from and was designed to resolve an ongoing proceeding" and included "intrinsically regulatory" terms of a type that the agency "frequently employs its expertise in reviewing," *MCI Telecomms. Corp. v. F.C.C.*, 822 F.2d 80, 84-85 (D.C. Cir. 1987).[9]

Wolkowitz next contends that deference is inappropriate because the FDIC stands to benefit from its own interpretation. *See Chikaloon-Moose Creek Native Ass'n v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004). However, the FDIC does not necessarily stand to gain if deficits are calculated by reference to banks' call reports, even if it did so here. In fact, it is

---

[9]This case law also forecloses the Trustee's argument that deference to any agency interpretation is appropriate only when the subject matter of the statute or regulation is technical, complex, or outside the realm of judicial expertise.

unclear whether Imperial's obligation would increase or decrease if the calculation date were changed to July 22.

**[8]** The Trustee's last argument is that even if the FDIC had nothing to gain from its interpretation of the regulation, its position in litigation is still not entitled to deference because it is unsupported by a regulation, ruling, or established administrative practice. However, *Smiley v. Citibank*, *N.A.*, 517 U.S. 735 (1996), only forbids deference to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." *Id.* at 741 (internal quotation marks omitted). The FDIC is certainly not litigating a wholly unsupported position here. The FDIC's reliance on quarterly bank Call reports is established in its regulations and its administrative practice. Several federal regulations require federally insured banks to file quarterly Call reports to the federal banking agencies, *see*, *e.g.*, 12 U.S.C. §§ 161, 248(a), 1817(a), and those agencies, including the FDIC, consistently rely on that data for a variety of regulatory purposes, *see*, *e.g.*, 12 C.F.R. §§ 1.4, 3.2, 8.2, 362.3(a)(2)(iii)(C), 303.14(c). For example, the FDIC relies on Call reports in determining the capital level of a bank, 12 C.F.R. § 6.2(j) (bank's total assets defined by information in Call report), in determining the date of a bank's effective capital category, 12 C.F.R. §§ 325.102, 6.3, and in approving or disapproving capital restoration plans, 12 C.F.R. § 208.44(b) (capital restoration plans must be prepared in accordance with instructions on the Call report). Thus, the FDIC's calculation of Imperial's liability as of SPB's latest Call report data is supported by its general practice of relying on Call reports for regulatory purposes.[10]

---

[10]The Trustee also argues that the FDIC's practice of using Call reports is contradicted by an internal memo which states that a deficit calculation "cannot and is not made until the bank initially fails to comply with the capital restoration plan." But the memo, like 12 C.F.R. § 325.104(h)(1)(B), merely addresses when the limit of liability is to be measured, not what data are to be used in the calculation.

**[9]** In light of the above, we affirm the district court's calculation of Imperial's liability under performance guaranty using SPB's June 30, 2002 Call report data.

### 2. *Credit for $5 million post-guaranty payment*

The district court held that a $5 million transfer Imperial made to SPB on July 31, 2002, could not reduce Imperial's liability under the performance guaranty because the contract stated that Imperial's liability could not be "released, discharged, or in any way affected by any circumstance, condition, or matter . . . including (v) any counterclaim, set-off, deduction or defense [Imperial] may have against [SPB]." The Trustee contends that the $5 million payment was not a "set-off or deduction" but a partial payment towards its liability. He also argues that if the $5 million payment to SPB is a barred "deduction," then no payment could ever reduce its liability under the guaranty.

**[10]** We disagree. The $5 million payment to SPB clearly meets the definition of a deduction, which the Trustee himself defines as "an act of taking away" or "something that can be subtracted." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 589 (2002). Moreover, just because *this* $5 million transfer to SPB does not reduce Imperial's liability does not mean that no payment could reduce its liability. Had Imperial made a payment to SPB upon "demand" by the FDIC or "as directed" by the agency, as required by the language of the guaranty, the payment should have been properly credited toward its liability.[11] However, it is entirely implausible that Imperial intended a $5 million payment made to SPB in July of 2002 to reduce its obligation to the FDIC when the FDIC did not demand payment until September 2003, and Imperial was allegedly unaware of any obligation until the FDIC's demand.

---

[11]The guaranty stated that "[Imperial] will pay the sum demanded to the Company or as directed by the [FDIC] in immediately available funds promptly after receipt . . . of such demand."

Therefore, we affirm the district court's calculation of Imperial's deficit at $18,375,800.

## C. *The district court erred in dismissing the fraudulent conveyance claim*

In the district court, Imperial sought to avoid any obligation created by the performance guaranty as a constructive fraudulent conveyance under 11 U.S.C. § 548. The district court dismissed this claim as barred by 12 U.S.C. § 1828(u)(1) unless Imperial could plead actual fraud, which it was unable to do. Imperial argues that this decision was based on an erroneous interpretation of § 1828(u) and asks the panel to reinstate its fraudulent conveyance claim. The FDIC requests the panel affirm the district court because the fraudulent conveyance claim was a "trustee defense," and so was barred by 11 U.S.C. § 365(o). In the alternative, the FDIC argues that the district court properly interpreted 12 U.S.C. § 1828(u).[12]

### 1. *The fraudulent conveyance claim's status as a trustee defense*

In its February 15, 2005, order, the district court held that Imperial could not exercise its powers as a trustee without first curing its deficit to the FDIC under § 365(o). The district court held that Imperial's fraudulent conveyance claim was a "trustee defense" made on behalf of its creditors, and that Imperial, therefore, could not litigate that defense until it cured its obligation to the FDIC. However, the court did not dismiss the fraudulent conveyance claim for that reason, as it

---

[12]We have jurisdiction to hear this claim even though the Trustee's fraudulent conveyance claim is an appeal from the district court's August 4, 2004 and February 14, 2005 orders, which were not appealable in their own right when the briefs were filed. "[O]rders adjudicating only some of the claims may be treated as final orders if the remaining claims have subsequently been finalized," *Anderson v. Allstate Ins.Co.*, 630 F.2d 677, 680 (9th Cir. 1980). In this case, a final judgment was ordered on November 28, 2006, disposing of all the claims between the parties.

had already dismissed the claim as barred by § 1828(u). The FDIC urges the panel to affirm the district court's dismissal of the fraudulent conveyance claim because Imperial was barred from bringing it in the first place as a "trustee defense."

**[11]** We decline to affirm on that basis. Section 365(o) requires immediate cure of a deficit to a federal depository institution under a performance guaranty only when the debtor is in Chapter 11. A Chapter 7 debtor is under no obligation to immediately cure such a deficit. Accordingly, the district court's holding that Imperial could not bring "trustee defenses" until it cured its deficit under § 365(o) necessarily applies only to debtors in Chapter 11, not debtors in Chapter 7 like Imperial. Although the district court need not have reached the question whether the fraudulent conveyance claim survived dismissal in the Chapter 11 proceeding, it did in fact dismiss the claim as barred by § 1828(u). Now that Imperial is in Chapter 7, we cannot affirm its dismissal of the fraudulent conveyance claim on the separate ground that it was a barred "trustee defense" in Chapter 11. That question is moot, and Imperial's fraudulent conveyance defense is viable now, unless precluded by § 1828(u).

### 2.  *Section 1828(u) and the Fraudulent Conveyance Claim*

Because we cannot affirm the dismissal of the fraudulent conveyance claim as a barred "trustee defense," we address the Trustee's argument that the district court erroneously dismissed its fraudulent conveyance claim as barred by 12 U.S.C. § 1828(u). Wolkowitz argues that the statute prohibits persons from bringing only fraudulent conveyance claims regarding a transfer of assets and thus does not bar Imperial's claim requesting the voiding of an obligation under a performance guaranty. The district court rejected this argument below, holding that Imperial's argument was based on an "unsupported distinction between assets and obligations."

**[12]** To the contrary, we find that the distinction between assets and obligations is supported by the plain language of the statute and the legislative history. On its face, § 1828(u)[13] prohibits persons from bringing fraudulent conveyance claims against federal banking agencies only for "the return of assets . . . transferred to" a federally insured bank or "for monetary damages or other legal or equitable relief in connection with such transfer," if the transfer was made when the insured bank was undercapitalized. The statute makes no mention of obligations, which is what Imperial is attempting to avoid as a fraudulent conveyance.[14]

Moreover, the House Conference Report reveals that the purpose of § 1828(u) is to protect the federal deposit insurance funds from claims brought by the bankruptcy trustee of a depository institution holding company "for the return of capital infusions," not for the avoidance of obligations. H.R. Rep. No. 106-434, at 183 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 245, 276. And related statutes addressing fraudulent conveyances recognize the distinction between avoiding an obligation and recovering a transfer, suggesting that Congress intentionally omitted obligations from

---

[13]The statute provides that:

> No person may bring a claim against any Federal banking agency . . . for the return of assets of . . . [a] controlling shareholder of the insured depository institution transferred to, or for the benefit of, an insured depository institution by such . . . controlling shareholder of the insured depository institution, or a claim against such Federal banking agency for monetary damages or other legal or equitable relief in connection with such transfer, if at the time of the transfer [the insured institution was undercapitalized].

12 U.S.C. § 1828(u)(1); *see also id.* § 1828(u)(2)(A) (for purposes of § 1828(u)(1), the term "claim" includes a cause of action providing for avoidance of fraudulent conveyances).

[14]Note that any payments under the guaranty would clearly constitute a "transfer of assets" and therefore § 1828(u) would bar the Trustee from arguing that they were fraudulent conveyances.

§ 1828(u). *Compare* 12 U.S.C. § 1821(d)(17)(A) ("The Corporation . . . may avoid a transfer of any interest of an institution-affiliated party . . . or any obligation incurred by such party or person . . . .") *with* 12 U.S.C. § 1828(u) (only barring claims based on transfers of assets); *see Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " (quotation source omitted)). Academic articles also have clarified that a guaranty is not equivalent to a transfer. *See* Phillip I. Blumberg, *Intragroup Guaranties Under the Uniform Fraudulent Transfer Act*, 9 CARDOZO L. REV. 685, 703 (1987) ("With the issuance of a guaranty, the guarantor incurs an obligation, but no transfer takes place. A transfer takes place only when the guarantor or some other party makes a payment in reduction of the indebtedness that has been guaranteed. Thus, it is clear that the issuance of a guaranty is not included in [a statute barring transfers] although payments pursuant to the guaranty are, of course, included." (footnote omitted)).

**[13]** The FDIC is unable to effectively rebut our reading of § 1828(u) as barring only claims based on transfers of assets. It attempts to argue that the term "asset" in § 1828(u) should be defined broadly as "something of value," but fails to support its interpretation with any statutory text, legislative history or case law. The FDIC also puts forth a policy argument, contending that if § 1828(u) is limited to transfers of assets, then it will render performance guaranties effectively unenforceable against insolvent parent companies of federally insured banks. This argument is flawed, though, because it assumes that if the Trustee's fraudulent conveyance claim survived dismissal, it would necessarily prevail on the merits, when the next step would be for a court to determine whether the performance guaranty represented a fraudulent conveyance that could be avoided under 11 U.S.C. § 548.

**[14]** In light of the above, we reverse the district court's dismissal of the fraudulent conveyance claim as barred by § 1828(u), and remand for further proceedings.

*D.     The FDIC's claim is entitled to only ninth priority in the Chapter 7 proceeding*

**[15]** The district court held that Imperial owed the FDIC $18,375,800 based on its obligation under the performance guaranty. Per 11 U.S.C. § 365(o), which mandates immediate payment of deficits to federal depository institutions, the court ordered Imperial to cure its deficit as a condition of remaining in Chapter 11. Alternatively, the court noted that Imperial could convert to Chapter 7, in which case its "unsatisfied cure obligation [would] have the status and priority in the Chapter 7 case which it is accorded under applicable bankruptcy law." Imperial converted to Chapter 7, and litigation over the status of the FDIC's claim ensued. The district court determined that the FDIC's claim was entitled to administrative priority in the Chapter 7 case under 11 U.S.C. § 507(a)(2). The Trustee argues that §§ 365(o) and 507 of the Bankruptcy Code relegate the FDIC's claim to ninth priority. The FDIC argues that the district court correctly accorded its claim administrative priority. The priority of a claim arising from an uncured deficit under § 365(o) is an issue of first impression.

**[16]** Section 365(o) was enacted as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, which constitutes Title XXV of the Crime Control Act of 1990, Pub. L. No. 101-647, § 2522, 104 Stat. 4859, 4866. As part of its response to the savings and loan crisis, Congress sought to prevent parties affiliated with federal depository institutions from "using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution." H.R. Rep. No. 681(I), at 179 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6585; *Resolution Trust Corp. v. Firstcorp., Inc. (In re Firstcorp, Inc.)*, 973 F.2d 243, 246 (4th Cir. 1992). Section 365(o) accom-

plished this goal by taking away a trustee's ordinary power to avoid a debtor's executory contracts under § 365(a).[15] *Id.* at 180, *reprinted in* 1990 U.S.C.C.A.N. 6472, 6586. The statute provides that "[i]n a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency." 11 U.S.C. § 365(o). This "assumption and cure" mechanism has been interpreted to require a trustee to immediately pay any deficit to a federal depository institution as a condition of remaining in Chapter 11. *Firstcorp*, 973 F.2d at 247. "If a debtor cannot 'immediately' cure a deficit under a capital maintenance commitment that exists at the time of a bankruptcy filing, then § 365(o) requires that debtor to proceed not under Chapter 11 but under Chapter 7, to which § 365(o) does not apply." *Id.*

[17] In addition to its assumption and immediate cure requirement, § 365(o) addresses the priority of a claim arising from an obligation under a capital maintenance commitment. The second portion of the statute provides that any claim for a "subsequent breach of . . . obligations [under a commitment to maintain the capital of a federally insured depository institution] shall be entitled to priority under section 507." The reference to § 507 in § 365(o) directs the reader to § 507(a)(9). That provision, also enacted as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, places "unsecured claims based on any commitment by the debtor to a Federal depository institutions regulatory agency . . . to maintain the capital of an insured depository institution" in ninth priority in a bankruptcy case.[16]

---

[15]Section 365(a) provides that, with certain exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a).

[16]The current § 507(a)(9) was enacted as § 507(a)(8). It was redesignated § 507(a)(9) in the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 304, 108 Stat. 4186, 4132.

The plain language of § 365(o) and § 507(a)(9) suggests that the FDIC's claim under the performance guaranty — the result of a subsequent breach of an obligation under a capital maintenance commitment — is entitled to ninth priority.

The district court instead held that the FDIC's claim was entitled to administrative priority under § 507(a)(2), which allows second priority to "administrative expenses" including the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. §§ 507(a)(2), 503(b)(1).[17] It found that Imperial's failure to cure its deficit to the FDIC was equivalent to an obligation arising from an executory contract, defined in the bankruptcy context as a contract in which "the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach." *Felix Cattle Co. v. Silver (In re Select-A-Seat Corp.)*, 625 F.2d 290, 292 (9th Cir. 1980) (per curiam) (internal quotation mark omitted). Reasoning that obligations arising from executory contracts are generally accorded administrative priority in the bankruptcy context, *Collingwood Grain*, *Inc. v. Coast Trading Co. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir. 1984), and retain that status in Chapter 7 cases, 11 U.S.C. § 726, the district court held that the FDIC's claim was entitled to administrative status in its Chapter 7 case.

While initially plausible, this reasoning is ultimately unpersuasive. First, we note that to the extent there is any ambiguity in the meaning of §§ 507(a)(9) and 507(a)(2), § 507(a)(9)'s specific reference to debtors' commitments to federal depository institutions "to maintain the capital of an insured depository institution" should govern over § 507(a)(2)'s more general provision which arguably could cover the same subject matter. *See Fourco Glass Co. v.*

---

[17]Only domestic support obligations and certain administrative expenses of the trustee are paid before § 507(a)(2) expenses. *See* 11 U.S.C. 507(a)(1).

*Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (internal quotation marks omitted)).

[18] More importantly, we simply fail to see how Imperial's obligation to the FDIC constitutes an administrative expense. Administrative expenses are defined in the Bankruptcy Code as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1).[18] We recognize that, generally, an executory contract that the trustee assumes post-petition under § 365(a) is accorded administrative priority for the purpose of "encourag[ing] third parties to contract with the bankruptcy estate for the benefit of the estate as a whole." *Boeing N. Am.*, *Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026 (9th Cir. 2005). However, the Trustee's assumption of Imperial's executory contract with the FDIC when it filed for Chapter 11 cannot be equated with a trustee's assumption of an ordinary executory contract. Under § 365(a), a trustee can *choose* to assume or a reject an executory contract. Section 365(o) creates an exception to the trustee's assume or reject power, *Firstcorp*, 973 F.3d at 247, because when the contract at issue is a capital maintenance agreement with a federal depository institution, the trustee *automatically assumes* the contract when it files for Chapter 11 under § 365(o). Because of the required assumption, the stated rationale for according claims arising from assumed executory contracts administrative status — encouraging debtors to transact with the estate — is not implicated. Accordingly, the FDIC's claim is not an administrative expense as it is not an "actual, necessary" cost of preserving Imperial's Chapter 7 estate. It must instead be granted ninth priority per the specific language in § 507(a)(9).

---

[18]Administrative expenses also include various other expenses such as certain taxes, fines, compensation and reimbursement, *see* 11 U.S.C. § 503(b)(1)(C)-(D), (b)(2)-(4), but the general definition in § 503(b)(1)(A) is the only applicable provision here.

A holding to the contrary would lead to nonsensical results. The parties agree that had Imperial initially filed under Chapter 7, the FDIC's claim would be in ninth priority. Section 365(o) never comes into play in Chapter 7 cases, so the FDIC's claim would necessarily be categorized as an "allowed unsecured claim[ ] based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution" under § 507(a)(9). In contrast, based on the district court's analysis, the FDIC's claim is entitled to administrative priority in this case simply because Imperial initially filed for Chapter 11. We see no principled reason why a Chapter 7 debtor should be treated differently based on whether it initially filed in Chapter 11 or Chapter 7, when in either case the debtor ends up in Chapter 7 without benefitting from Chapter 11 reorganization possibilities. *See United State v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) ("We are instructed to avoid, if possible, an interpretation that would produce 'an absurd and unjust result . . . .' ") (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)).

Granting the FDIC's claim administrative status would also erroneously read language into § 365(o) that does not appear in the statute. A debtor with an uncured capital maintenance obligation to a federal depository institution cannot reorganize under Chapter 11 unless it first cures its deficit, and it can avoid the immediate cure obligation only by liquidating under Chapter 7. Indeed, while the district court held that the FDIC's claim was entitled to administrative priority in Chapter 11 and retained that status in Chapter 7, in actuality Imperial was unable to even *enter* Chapter 11 due to its failure to cure its deficit under 11 U.S.C. § 365(o). We believe that preclusion of reorganization under Chapter 11 is the only consequence Congress prescribed for a debtor who fails to cure its obligation under § 365(o), and that we would be adding to the statute if we instead held that debtors faced the additional consequence of administrative priority post-conversion. *See*

*Franklin Sav. Corp. v. Office of Thrift Supervision*, 303 B.R. 488, 502 (D. Kan. 2004) ("The remedy for a debtor's inability to cure the capital deficiency is that the debtor may be prohibited from proceeding under Chapter 11," not that the FDIC be entitled to a superpriority claim.); *see also Firstcorp*, 973 F.2d at 248 (Section 365(o) was intended to prevent bank holding companies from "us[ing] a Chapter 11 reorganization to jettison the subsidiary in an effort to enhance [their] own financial position and that of its creditors . . . . If the holding company is not financially able to satisfy its capital maintenance obligations, then § 365(o) denies it the opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option.").

Last, our result is not undermined by the Fourth Circuit's decision in *Firstcorp*, as the FDIC suggests. *Firstcorp* held that a debtor was required to immediately cure any deficits in capital maintenance obligations owed to federal depository institutions upon filing for Chapter 11 under § 365(o). 973 F.3d at 247-48. In reaching that holding, the Fourth Circuit addressed the reference to § 507 in § 365(o), which the debtor argued relegated the FDIC's claim to ninth priority, rather than immediate cure status. *Id.* In an effort to explain the reference to § 507, the court drew a distinction between obligations arising from a pre-petition breach of a capital maintenance commitment and obligations arising from a post-petition or "subsequent breach" of a capital maintenance commitment. It held that pre-petition breaches had to be cured immediately upon filing for Chapter 11, while post-petition breaches in Chapter 11 cases were entitled only to ninth priority. *See id.* at 248 (the reference to § 507 "merely indicates that breaches in capital maintenance obligations that arise after the bankruptcy filing are subject to the priority scheme of § 507").

The *Firstcorp* court interpreted the scope of the immediate cure obligation under § 365(o) in a Chapter 11 case only, and never purported to address the priority of any claims. *Id.* at

247-48. The court explicitly declined to address the priority of claims arising from post-petition breaches in Chapter 11 cases, *id.* at 248 n.4, and the issue confronting us here — the priority of a claim arising from a pre-petition breach post-conversion to Chapter 7 — was never even raised before the *Firstcorp* court, *id.* at 247-48. Thus, although *Firstcorp* held that the reference to § 507 in § 365(o) suggested that post-petition or "subsequent" breaches of capital maintenance obligations would be entitled to ninth priority in Chapter 11 cases, it does not foreclose our conclusion that a debtor's failure to cure a pre-petition capital maintenance obligation is also subject to the § 507 priority scheme post-conversion to Chapter 7.

**[19]** Accordingly, we hold that a failure to cure a § 365(o) deficit in a Chapter 11 case does not give rise to an administrative priority in a Chapter 7 case. Rather, the FDIC's claim attributable to Imperial's failure to cure its debt is entitled only to ninth priority under §§ 365(o) and 507(a)(9). We thus remand to the district court for further proceedings consistent with this opinion.

### III.   CONCLUSION

We affirm in part, and reverse and remand in part. Each party shall bear its own costs on appeal.